DB5ETRAC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ANH NGUYET TRAN, et al.,

4                    Plaintiffs,

5            v.                              13 CV 580(RPP)

6   BANK OF NEW YORK, et al.,

7                    Defendants.

8   ------------------------------x

9                                           November 5, 2013

10                                          10:16 a.m.

11

12   Before:

13                   HON. ROBERT P. PATTERSON, JR.,

14                                          District Judge

                             APPEARANCES
15
    TOMAS ESPINOSA
16       Attorney for Plaintiffs

17   DORSEY & WHITNEY, LLP
         Attorneys for Defendant US Bank National Association
18   BY:  ERIC R. SHERMAN

19   MORGAN LEWIS & BOCKIUS, LLP
         Attorneys for Defendant Deutsche Bank National Trust
20       Company
    BY:  BERNARD J. GARBUTT, III
21
    BRYAN CAVE LLP
22       Attorneys for Defendant Bank of New York
    BY:  CHRISTINE CESARE
23
    HOGAN LOVELLS
24       Attorneys for Defendant HSBC Bank USA National Association
    BY:  PATRICK J. DEMPSEY
25
```

DB5ETRAC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DB5ETRAC

1              (In open court)

2              THE DEPUTY CLERK:  Anh Tran versus Bank of New York.

3    Is the plaintiff ready?

4              MR. ESPINOSA:  Yes, your Honor.  Good morning.  Thomas

5    Espinosa on behalf of Anh Tran, et al.

6              THE COURT:  Good morning, Mr. Espinosa.

7              THE DEPUTY CLERK:  And are defendants ready?

8              MR. SHERMAN:  Yes, we are.  Good morning, your Honor.

9    Eric Sherman for defendant US Bank National Association in its

10   capacity as trustee of the various trusts named in the amended

11   complaint.  I'll be presenting argument this morning for all

12   the defendants.

13             THE COURT:  Good morning, Mr. Sherman.

14             So this is your motion.  So why don't we hear from

15   you.

16             MR. SHERMAN:  May it please the Court.

17             Your Honor, before you this morning is a case with

18   three insurmountable problems.  The plaintiffs in this case

19   have no standing.  They have pleaded no substantive claim.  And

20   because of the statute of limitations applicable to their RICO

21   claims, they have no available remedy.

22             But even if plaintiffs could solve each of those three

23   problems, 38 of the 39 plaintiffs before you would have to be

24   dismissed because they lack the unifying transaction occurrence

25   or series of transactions or occurrences necessary for

4

DB5ETRAC

1    permissive joinder under Rule 20.

2            I'd first like to address the standing point, since it

3    is, of course, a threshold issue.  In their opposition

4    plaintiffs admit that their claims rest in the entirety upon

5    the assertion that parties to pooling and servicing agreements

6    did not strictly follow the provisions of those agreements with

7    respect to the transfer of paperwork documenting individual

8    mortgage loans.

9            Now, the problem with that is that plaintiffs are not

10   parties to those pooling and servicing agreements, or PSAs, and

11   the PSAs are not intended to benefit them.  And so they lack

12   standing.  And every federal appellate court to consider this

13   issue has held that a borrower in the position of the

14   plaintiffs lack standing to challenge the transfer of a loan

15   when that challenge is based upon alleged noncompliance with a

16   PSA.

17           THE COURT:  I read your brief on that matter, and it

18   seemed to me that you were all focused on Sixth Circuit cases

19   and the other cases from the middle west.  I know your firm

20   originates from that area, and maybe that's the cause.  But it

21   seemed to me that Mr. Espinosa is relying on New York law, and

22   you didn't seem to address that in your papers at all.

23           MR. SHERMAN:  Well, your Honor, I believe we did

24   address it in reply.  What Mr. Espinosa is relying on is the

25   decision of one trial court judge from Kings County and a

DB5ETRAC

1    decision out of the California Court of Appeals, which is based

2    entirely on that trial court decision.  And quite simply, your

3    Honor, those two courts got New York law wrong.  In fact, what

4    some courts have held is that there is standing to challenge

5    transfers that are void in the first instance.  And the

6    majority of New York cases hold that under New York law the

7    sorts of defects that plaintiffs are alleging here do not

8    render transfers void.  They render them merely voidable and,

9    therefore --

10         THE COURT:  That, again, is a lower court case, isn't

11   it?

12         MR. SHERMAN:  I'm sorry, your Honor?

13         THE COURT:  That, again, is a lower court case, not a

14   case on appeal.  The voidable issue is a lower court case,

15   isn't it, that you're relying on?

16         MR. SHERMAN:  That may be true, your Honor, but the

17   overwhelming -- we rely on the *McManus* and *Cashman* cases, and I

18   believe those cases are cited in our reply on page three.  And

19   the overwhelming weight of authority, though, in New York, as

20   was examined exhaustively in the *Bassman* case, which the Court

21   can find in our page six, is that these transfers are merely

22   voidable and, because they're voidable, insufficient to confer

23   standing upon the plaintiffs.

24         THE COURT:  I'll have to look at the *Bassman* case.  I

25   didn't have a chance last night to look at it.

DB5ETRAC

1          MR. SHERMAN:  Your Honor, the plaintiffs' second

2     argument, their second bid for standing is based upon their

3     argument that this is a motion to dismiss and that there is at

4     least a fact question out there about whether they're

5     third-party beneficiaries of the PSAs.

6          There are two problems with that argument.  First,

7     your Honor, the plaintiffs have to be intended third-party

8     beneficiaries for the PSAs; and second, the plaintiffs actually

9     have to allege that status in their complaint, which they have

10     not -- their opposition points to no paragraphs in the amended

11     complaint where they allege that they are clearly intended

12     third-party beneficiaries of the PSAs.  And so, your Honor, we

13     submit that plaintiffs lack standing to maintain the RICO

14     claims.

15          But even if plaintiffs had standing, they would still

16     have to sufficiently allege the elements of a RICO claim, and

17     they haven't done that either.  The first flaw in the RICO

18     claim is that they have no injury or causation.

19          Now, to have a RICO claim, you have to have an injury

20     to business or to property.  And the plaintiffs here identify

21     two potential injuries.  First, they point to the mortgage

22     payments that they made after securitization.  Well, your

23     Honor, that's not an injury because this is money that the

24     plaintiffs borrowed.  They agreed to pay it back.  And they are

25     not alleging that they are paying anything more than they

DB5ETRAC

1    agreed to pay.

2           The second potential injury that the amended complaint

3    raises are the foreclosures, but the foreclosures, your Honor,

4    are not caused by securitization.  These plaintiffs aren't

5    saying that they were put into foreclosure because of the

6    transfer of their mortgage loans.  This is a situation that

7    they would be in even if the loans were still in the hands of

8    the original lenders.  And so plaintiffs have not sufficiently

9    alleged injury or causation to support their RICO claim.

10          The second flaw, your Honor, is that there is no

11   pattern of racketeering activity in the amended complaint.

12   Plaintiffs allege mail and wire fraud, and because they do

13   that, they have to plead with particularity.  If there's a

14   fraud, they have to say what the fraudulent communication was,

15   who made the fraudulent communication, where did they make it,

16   when did they make it, why was it fraudulent and how were the

17   mails or wires used in furtherance of the scheme.  And the

18   plaintiffs plead none of this detail.  And so they haven't

19   pleaded a pattern of racketeering activity.

20          Finally, your Honor, the plaintiffs have failed to

21   allege that any defendant participated in the conduct of

22   racketeering enterprise.

23          Now, plaintiffs' reply discloses that they're

24   attempting to make out an association in fact enterprise.  And

25   they say that consists of the defendants, the servicers, the

8

DB5ETRAC

1   associated corporations of the defendants and even the courts.

2   But what's lacking from plaintiffs' amended complaint, your

3   Honor, are facts showing how this association in fact

4   supposedly worked together towards some purpose.  There are no

5   facts in the complaint about how these defendants worked

6   together.  There are facts that the defendants are all banks,

7   that some industry practices are similar, but no facts about

8   how these defendants communicated, how they worked together.

9   And so there is insufficient pleading of participation of

10  conduct of a RICO enterprise.

11          And, your Honor, because there's no substantive RICO

12  claim as a result of those three problems, there's no RICO

13  conspiracy claim either.  Because to have a conspiracy, you

14  must have in the first instance a substantive RICO claim.

15          I'd like to talk about the third problem with

16  plaintiffs' claims, which is the statute of limitations.  Your

17  Honor, as a result of the novel way in which the plaintiffs

18  have conceptualized their injury in this case, they pleaded

19  themselves out of court.  There's a four-year statute of

20  limitations applicable to RICO claims.  That statute begins to

21  run when the plaintiff discovers the injury and plaintiffs are

22  very clear about what their injury is.  They claim that their

23  injury are all the mortgage payments that they made after

24  securitization, after the PSA closing date applicable to each

25  of their loans.  And the plaintiff supplied those dates in

9

DB5ETRAC

1      Exhibit 1 to the amended complaint.  And each one of those

2      dates was more than four years ago, and so --

3                  THE COURT:  When did they learn of it?

4                  MR. SHERMAN:  Well, the question under settled law,

5      your Honor, is when did they learn of the injury?  And when you

6      conceptualize your injury as the mortgage payment, these

7      plaintiffs had to have known that they were making mortgage

8      payments.  I mean, the fact that plaintiffs lack an injury

9      that's cognizable under RICO, and the fact that they have

10     brought their claims outside of the statute of limitations, are

11     two connected issues.  If plaintiff -- because --

12                 THE COURT:  I don't follow you.

13                 MR. SHERMAN:  Well, your Honor, where the plaintiffs

14     conceptualize their injury as simply the payment of their

15     mortgage payments, that's something that they discovered as

16     they were making the payments.  And, therefore --

17                 THE COURT:  What are you referring to in the complaint

18     that shows that?

19                 MR. SHERMAN:  Well, your Honor, what I'm referring to

20     in the complaint is what the plaintiffs claim their injuries

21     were, that they were making the payments.  And Exhibit 1 to the

22     amended complaint --

23                 THE COURT:  They admit that they're making the

24     payments, but the question is, when did they know that -- when

25     did they learn that the pooling agreements have these

DB5ETRAC

1    limitations?

2           MR. SHERMAN:  Well, your Honor, that fact is not in

3    the record, but to apply the statute of limitations in this

4    case, it doesn't need to be in the record, because all that the

5    plaintiffs have to discover is their injury.  And then they're

6    expected to exercise due diligence to discover the rest of the

7    facts in support.

8           THE COURT:  How did they learn the injury if they

9    don't know what the pooling agreement required?

10          MR. SHERMAN:  Well, your Honor, where the plaintiffs

11   conceptualize their injury as simply the making of payments on

12   the loan that they agreed to pay, that is the fact of injury.

13   And the fact --

14          THE COURT:  They're making the complaint as of 2012 or

15   '13, and that's when they make their complaint?

16          MR. SHERMAN:  Correct.

17          THE COURT:  So why does that apply back to 2008 or

18   2009 as to their knowledge?

19          MR. SHERMAN:  Because the only fact that they have to

20   know to trigger the running of the statute of the limitations

21   is the fact of injury, and where plaintiffs define the injury

22   as the making of payments.

23          THE COURT:  I don't follow your logic.

24          MR. SHERMAN:  Well, your Honor, the fact that

25   plaintiffs now claim that there was some defect in the transfer

DB5ETRAC

1    of their loans is a fact unrelated to injury.  The injury to

2    business or property, the defendants maintain, and the

3    plaintiffs plead in their complaint, is the making of the

4    payments.  And that's the defendants' argument on statute of

5    limitations.

6          Now, your Honor, a word about repleading.  Although in

7    some cases courts have held that it's appropriate to grant

8    leave to replead, this is not one of those cases for three

9    reasons:  First, your Honor, the plaintiffs have already

10   availed themselves of the opportunity to amend the complaint as

11   a matter of right.

12         Second, your Honor, plaintiffs' opposition does not

13   disclose how they would fix the myriad problems with their

14   claims.

15         And the last reason is that these 39 plaintiffs are

16   misjoined.  Under Rule 20, the plaintiffs have to assert a

17   right to relief that arises out of the same transaction or

18   series of transactions, and plaintiffs don't do that.  Their

19   complaint invokes the provisions of 37 different pooling and

20   servicing agreements as applied to the conveyance of 37

21   different mortgages.  And courts have repeatedly ruled that

22   separate loan transactions by different lenders did not satisfy

23   Rule 20.

24         And the *Barber* case, which is discussed at page 21 of

25   our initial memorandum, I think, is particularly instructive in

DB5ETRAC

1  this regard.  Like the plaintiffs here, the *Barber* plaintiffs

2  allege harm from the securitization process.  Like the

3  plaintiffs here, the plaintiffs in *Barber* allege separate loan

4  transactions with different lenders.  And like the plaintiffs

5  here, the plaintiffs failed to allege any concerted activity by

6  defendants.  And so what the *Barber* court did is it dropped all

7  but the first named plaintiff in that case.

8          THE COURT:  Is that Judge Kunstler's case you're

9  referring to?

10         MR. SHERMAN:  That could be, your Honor.  I'm sorry.

11  I'm not --

12         THE COURT:  Go on.

13         MR. SHERMAN:  So under *Barber* and the other cases upon

14  which we rely, the plaintiffs are misjoined, and all but the

15  first named plaintiff should be dismissed.

16         So, your Honor, because of plaintiffs' lack of

17  standing, because of their lack of any substantive claim,

18  because of their lack of compliance with the statute of

19  limitations, we ask that you dismiss the amended complaint with

20  prejudice.  And if the Court's not inclined to dismiss the

21  amended complaint with prejudice, then we ask you to drop all

22  but the first named plaintiff Tran.

23         And unless the Court has any questions, I'll take my

24  seat.

25         THE COURT:  Okay.

DB5ETRAC

1          MR. ESPINOSA:  Your Honor, I'm going to address first

2     the basis for the claim of fraud, which is the concealment and

3     fraudulent conduct in respect, your Honor, to the

4     securitization process.

5          The defendant relied on what had been three groups of

6     theories and positions with respect to that.  One, privity of

7     contract.  And that is not, your Honor, the basis on which we

8     are bringing any action.  As a matter of fact, in my brief I

9     expressed that to go into the third-party beneficiary aspect of

10    that, it is factually ready and the issue should not be ruled

11    out.  But that is not the center theory in which the action has

12    been brought with respect to the fraud in this securitization

13    process.  It has been New York -- New York law is a strict

14    interpretation of the application of the EPTL to business

15    trusts.  And I say that, your Honor, because there is a lot of

16    argument about family trust in which the fiduciary duties is

17    what are central, and in reality rule the conduct of the

18    trustee or not.  In New York a business trust and the indenture

19    of the business trust, as I have briefed, is as strictly

20    construed as per the language of that indenture; in this case

21    the PSA, your Honor.

22          And that strict construction is what the *Glaski* case

23    in the Court of Appeals of California and the *Erobobo* case here

24    in New York, applying, your Honor, all of those other cases

25    that I have in my brief, of New York law, which is the guiding

DB5ETRAC

1    and controlling law in this case, chose by their own choice.

2              Your Honor, estate.  We don't have here just a common

3    trust.  We have a business trust, your Honor, in which there

4    creates an entity; an entity, your Honor, not only on the

5    New York association law, but also an entity under the

6    pass-through REMICs trust that they create under the IRS code,

7    860.

8              So we have an entity here, your Honor.  We don't have

9    here just a contract.  We have the document that constitutes

10   one of the associations that the business association of

11   New York creates, and also an entity that is created for the

12   purpose, your Honor, of complying with IRS code Section 860

13   that gives to them a special treatment with respect to taxes,

14   the power of the trustee to do anything in respect to the trust

15   fund that have to be conveyed according to the PSA to the trust

16   and to him.

17             THE COURT:  I don't have a copy of the PSA.

18             MR. ESPINOSA:  Your Honor, it is correct, we have

19   cited in the portion of the exhibit only the portions, without

20   giving it to your Honor as a copy.  And there was a decision

21   that, your Honor -- we didn't want to bring documents in

22   addition that might provoke the possibility of this being

23   converted into a motion for summary judgment when we don't have

24   all the discovery.  But we expressed there that the --

25             THE COURT:  You shouldn't be trying to avoid the

DB5ETRAC

1    language of the PSA.  I mean, I have to consider the PSA and

2    read the terms of the PSA.  And I don't think you provided the

3    PSA.

4             MR. ESPINOSA:  No, I did not provide a copy of the

5    PSA, your Honor.  That is correct.  But I addressed the

6    portions of the PSA which had been -- if you look there, your

7    Honor, in the back of my complaint, you will see that it's

8    listed in the last 2.1 or 2.2, in every PSA -- we had a

9    mountain of PSAs.  We have 39 PSAs, your Honor.

10            THE COURT:  I'm sure, because I remember when these

11   pooling arrangements were drafted, and principally by Thacher

12   Proffitt and several other firms who specialized in drawing

13   these pooling agreements.

14            MR. ESPINOSA:  And they, your Honor, serve --

15            THE COURT:  Pretty effective lawyers usually, but I

16   have to read the entire document.  I can't just read one

17   paragraph or another paragraph.

18            MR. ESPINOSA:  Your Honor, it's a massive document.

19   We would have then to put it this position, your Honor -- we

20   will then, your Honor.

21            Now, your Honor, this PSA, in what you will see to be

22   usually 2.1 section, expressly states how the transfer of all

23   of the trust funds, which includes assignments, notes,

24   everything, has to be done by before or by a particular day,

25   which is the closing date.  And clearly so, your Honor, because

DB5ETRAC

they have to be a closing date for a trust to be formed.  When all of the --

        THE COURT:  But it's common in trusts to accept the other properties, subject to the same conditions as were in effect prior to the closing date.  I mean, people add properties to trusts all the time.

        MR. ESPINOSA:  But not, your Honor, in a business trust where they -- the indenture is strictly -- say how it has to be done.  As a matter of fact, your Honor --

        THE COURT:  I can see how it would have to be done before any transfer of the properties to a third party, but I don't see why the trust agreement can't be amended by mutual agreement.

        MR. ESPINOSA:  Because, your Honor, the trust already had a condition -- usually you have a condition with respect to any defect to be cured within the 30-day period.  And, your Honor, everything -- it's still with that, all of the -- there was no cure with respect to that only 30-day period, if all of the assignments that were made in each one of the trusts were years after the closing date.  Your Honor, not only --

        THE COURT:  Years after the closing date?

        MR. ESPINOSA:  That's correct, your Honor.  In fact, in each one of the occasions the transfer of the assignment for the purpose of foreclosure is done, it was done, your Honor, for the purpose only when they went to foreclose on all of

DB5ETRAC

1    those people.  And they are listed in there in our complaint.

2    Your Honor, why is -- the trust, the actions of the trustee

3    might have a tremendous effect in a trust of this nature,

4    because if it happened, precisely what had happened in this

5    case, this trust would lose all of the protection of the IRS

6    and the beneficiary would be hit hard.

7            THE COURT:  No, but in all these cases did the

8    mortgagor have a note that he had to satisfy on a monthly

9    basis, and that note would require him to make the payments on

10   a monthly basis.  It seems to me that the injury, if any, that

11   could have occurred from the transfer would be not to the

12   mortgagor, but to the mortgagee, because if they didn't receive

13   payment, they're the ones that get injured.

14           MR. ESPINOSA:  Your Honor, but New York doesn't

15   distinguish in the law about that.  It says that the action of

16   the trustee would be void as a matter of law, strictly.  And,

17   your Honor, when you speak about the possibility of changing it

18   and, therefore, ratification, which would make -- the *Bowman*

19   argument is not applicable here because *Bowman* and the others,

20   all of them, when they look at the law of New York, when they

21   went and looked at the law of New York, was with respect to

22   nonbusiness trust, which are strictly construed.

23           THE COURT:  I follow you.  But the injury would be to

24   the person, who, if there was a failure to transfer the funds

25   to the investor, the mortgage person who held the mortgage --

DB5ETRAC

1          MR. ESPINOSA:  But if you are in a position, your

2   Honor, in which the power of the trustee is as trustee bringing

3   an action against a third party, and that action is an

4   unauthorized action, then it would be an ultra vires action

5   that is prohibited not only by the PSA, your Honor.  It would

6   be evidence that it is a void act under New York law.

7          THE COURT:  When in the underlying litigations over

8   the foreclosures has this issue been raised in any of the

9   cases?

10          MR. ESPINOSA:  That, your Honor, I have not an answer.

11   But I will bring --

12          THE COURT:  Has the government researched that?

13          MR. ESPINOSA:  But I would bring to the attention of

14   the Court the following, your Honor.  Even let's suppose, your

15   Honor, that that would have been researched.  We have a problem

16   of fraud here because, under an aspect of New York trust law,

17   this trust had not been --

18          THE COURT:  You may be right, but has the matter been

19   raised, then why not in the underlying actions of foreclosure?

20          MR. ESPINOSA:  No, your Honor, because the only time

21   that this person learned --

22          THE COURT:  Because I might be bound by those

23   decisions.

24          MR. ESPINOSA:  No, your Honor.  Because in my

25   recollection of everything that I have discussed with my

DB5ETRAC

1    client -- and I'm not violating attorney-client privilege; it's

2    only for the sake of argument, your Honor, and for the

3    information of the trust, they only learn about this situation

4    when they use experts around October of 2012, and then the suit

5    was filed in January 2013.

6              THE COURT:  But they didn't raise it in the state

7    court?

8              MR. ESPINOSA:  That is my recollection, your Honor.

9              Your Honor, we are clear that *Bowman* and all the cases

10   of that nature do not apply, and that the cases that are cited

11   in which they were not business trusts with an indenture that

12   is interpreted and the law applied strictly do not apply.

13             But I go further, your Honor.  As I examine all of the

14   cases that they had in which they speak about privity of

15   contract, in none of those cases the New York trust law was an

16   issue at all.  As a matter of fact, the majority of the cases

17   it was never argued.  And naturally, in the face of a contract

18   in that -- without New York trust law, the decision was you

19   have not privity and, therefore -- there has been a too broad,

20   as the *Glaski* case says, painting of the obligation of the

21   privity argument.

22             But, your Honor, they know that it was created by the

23   banks.  They know that this was a business indenture.  Yes,

24   they don't contradict this.  They know that the New York law,

25   with respect to the void act of the trustee, were present in

DB5ETRAC

1    there, yes, they knew.  And nevertheless, they made a

2    representation in each one of those cases.

3              By the way, your Honor, the majority of the cases that

4    we have, were deed of trust cases in which the servicer was the

5    one who made the foreclosure and, therefore, your Honor, that

6    is another reason why there was no knowledge about this.  But

7    they have made from the beginning the representation that they

8    own this and received the money for that purpose.  They made

9    the representations also for the purpose of backing up

10   foreclosures of this nature, your Honor.  And up to the year

11   2012, when some of them were foreclosed, when the majority of

12   these cases were foreclosed, 2012, they have claimed the

13   benefit and are searching for taking the property out of the

14   clients, of the plaintiff to such a degree, your Honor, that

15   many of them after the 2012 date had the dispossession of their

16   property.

17             Let me, your Honor, visit another aspect of the case,

18   statute of limitations.  Your Honor, I confess to the fact that

19   I spoke of a Clayton Act and the four-year in a vacuum, despite

20   the fact that in the complaint we speak about the concealment

21   and the fact that they didn't know and all of that in the

22   Atwell complaint.  However, it's not the four-year Clayton Act

23   that applies here.  Your Honor, the Second Circuit has been

24   clear that it is the underlying -- you might call it tort, that

25   applies in such case.  And in this case the center theme is a

DB5ETRAC

```
1   fraud.  And if you look at the case of ContiCommodity Service,
2   which is a case of the Southern District, *Mahmoud Fustok v.*
3   *ContiCommodity Services*, which is a September 20, 1985, the
4   Court in a RICO case applied the six-year statute of limitation
5   for fraud.  If we go from time of injury by even the measure of
6   the time in which the foreclosure were made, everyone during
7   those six years -- the action had been filed timely.  But not
8   only that, your Honor, as you said, the discovery rule, not
9   only of the injury but, your Honor, of knowing that it was
10  caused by the racketeering organization and by the misdeed of
11  the trust.  So we are within the statute of limitations, your
12  Honor.  It has been brought up, and there is nothing in there
13  that will deny that in the four corners of the complaint.
14          Let's go, your Honor, to the older portion which I
15  believe is the argument that has been made with respect to the
16  fact that all of these trusts have been doing the same thing
17  doesn't mean that I have proved the basis for a conspiracy.  I
18  don't have, your Honor, in a complaint to raise the facts that
19  are alleged to a probability.  As a matter of fact, your Honor,
20  to raise it to a probability would be to come to a summary
21  judgment or to go to -- is the fact -- the fact made plausible
22  an inference that could be backed by this Court.  And, your
23  Honor, that is the holding in *Bell*.
24          THE COURT:  In what case?
25          MR. ESPINOSA:  In *Bell v. Twombly*, your Honor, the
```

DB5ETRAC

1   famous case in which the Conley standard was changed.

2           THE COURT:  What page of your brief are you reading

3   from?

4           MR. ESPINOSA:  I don't believe, your Honor, that I in

5   my brief brought that up.  I believe, your Honor, that -- let

6   me go and I will tell you which case it is, your Honor.

7           THE COURT:  Are you talking about *Twombly*?

8           MR. ESPINOSA:  Yes, your Honor.  *Bell Atlantic*

9   *Corporation v. William Twombly*.

10          THE COURT:  Right.

11          MR. ESPINOSA:  Forgive my diction, your Honor.

12          THE COURT:  That's all right.

13          MR. ESPINOSA:  *Twombly* clearly says that it doesn't

14  impose a probability standard at a pleading stage.  It simply

15  calls for enough fact to raise a reasonable expectation that

16  discovery will reveal evidence of the legal agreement.  And,

17  your Honor, and it's interesting that the argument that was

18  made in *Twombly* about parallelism implied parallelism that is

19  not an illegal parallelism.  Because the way in which you find

20  that the assumption to have happened independently is if it

21  would be of the nature of what you do if it is natural and it

22  has explanation for other reasons.  And, your Honor --

23          THE COURT:  You can't just plead a theory.  You can't

24  just plead a theory and satisfy *Twombly*.  You've got to plead

25  facts.

DB5ETRAC

1          MR. ESPINOSA:  And we did, your Honor.

2          THE COURT:  I don't see the facts.

3          MR. ESPINOSA:  And the facts that were pled were the

4     following, your Honor.

5          THE COURT:  But I don't see the facts as being facts.

6          MR. ESPINOSA:  Well, your Honor, but that is one of

7     the aspects, okay, that is more curable in a complaint.  But,

8     your Honor, let me explain what the facts are.  And facts, your

9     Honor, that are not just plausible, they raised themselves to

10    an almost 100 percent probability.

11         What would be the probability, your Honor, if I take

12    this heads and tails and I throw it up?  The probability would

13    be one divided by two.  But we have here one divided by one in

14    each of every act similar by each one of the defendants.  Did

15    they prepare the PSA?  Yes.  The PSA had the conditions which

16    they had to observe?  Yes.  In each one of them, there was a

17    dateline of closing?  Yes.  Did they violate each one of the

18    times that they had?  Yes.  Did they make representation to the

19    government that they have done that on time, because if not,

20    they will have lost the protection of the court?  Yes.  Did

21    they then engage in collecting money as if they were the owner,

22    when they knew that they were not the owner because they have

23    not met the finality rule for the creation of a New York trust?

24    Yes.  Did they then went ahead to court and to other places in

25    order to promote to the servicers the foreclosures?  Yes.

DB5ETRAC

1   Which were their agents, agent by the same document, which is

2   called the PSA.  Yes.

3         When you add all of them in a market that is

4   completely restricted in the sense that it is the security

5   market there and they are the players with respect to this, and

6   they have done it one after the other in each one of the 39

7   cases that we have here, if you flip it, it is not one divided

8   by two.  It is one divided by one.  Because in each one of

9   those occasions they did the same thing.  And it is not just --

10         THE COURT:  They're different people.  They're

11   different entities.

12         MR. ESPINOSA:  Your Honor, but using the same

13   methodology of breaking the law, not like in *Twombly*, your

14   Honor, in which what you had was the resistance to

15   competition -- and that would be something that is normal in

16   any cases of -- in which you are completely, but in this case

17   what we have is systematic fraud by the same method, by each

18   one of them.  The inference, the plausible inference that

19   discovery can bring up --

20         THE COURT:  But where is your fraud?  Where is your

21   fraud?

22         MR. ESPINOSA:  The fraud, your Honor?

23         THE COURT:  You didn't lose -- in RICO cases you have

24   to show loss of property of some sort.

25         MR. ESPINOSA:  Well, your Honor, the loss of property

DB5ETRAC

1    is the foreclosures from these people, the amount of money that

2    they had to pay to someone that -- they are subject, your

3    Honor, to the true owner of this loan to come to them and

4    collect money or foreclose on them, okay, during the whole

5    period of time that they -- and he covered the same amount of

6    money if they bring an action on the note alone instead of

7    foreclosure.

8              Now, your Honor, these people --

9              THE COURT:  My recollection is that there's also

10   another party that can bring it, and that's a person who is an

11   agent of the owner of the mortgage.

12             MR. ESPINOSA:  Well, your Honor, that would be under

13   the -- that would be, your Honor, under the rules of the

14   particular state -- I wasn't involved in the defenses of those

15   cases down at the state level at all.  But what we have here is

16   the measuring, your Honor, of economic or business damage.

17   It's clear that these people had economic and business damages.

18   And quantifiable.

19             THE COURT:  That they wouldn't have had otherwise?

20             MR. ESPINOSA:  Your Honor, yes, that they would not

21   have otherwise.

22             THE COURT:  Why not?

23             MR. ESPINOSA:  Let me explain why, your Honor.

24   Because if they would have been dealing with a person that

25   really was, they would not be subjected, your Honor, to the

26

DB5ETRAC

1    double fighting on that.  They lost their house already, your

2    Honor.  And they lost their house by dealing with someone that

3    did not have the right to foreclose on them.

4          THE COURT:  I'm not sure that you're correct on that,

5    because I haven't got a copy of the loan agreement and I don't

6    have a copy of any of the other agreements.

7          MR. ESPINOSA:  We will provide it, your Honor.  It

8    was, as I said, the amount of documentation that prohibit me.

9    And I didn't want to have, as I said -- and I repeat it again,

10   because it's the truth -- the situation in which this is

11   converted to a motion for summary judgment without discovery

12   and all of that.  That is in full honesty what precluded me.

13   And also the idea of the sheer amount of documents that we

14   have, your Honor.  We have not only the PSA, but the service

15   agreement and all of that.  And we can provide that to the

16   Court, your Honor.  But I exercised caution, and but now that

17   your Honor has indicated, that will go to your Honor, too.

18         THE COURT:  I have to read the instruments because I

19   never engaged in this practice.  But I'm well aware of a number

20   of very capable firms that drew up these documents, and I find

21   it a little hard to believe that they don't have provisions in

22   them that would be contrary to your argument.  So I have to

23   inspect that very carefully in order to make a decision on

24   that.

25         MR. ESPINOSA:  And, your Honor, also in each one of

DB5ETRAC

1    these, they had a mechanism by which they could certify if all

2    of these documents were there at the time of the closing.  It

3    is called the custodian of record certification and all of

4    that.  In my experience, in my experience in litigating cases

5    in defense of foreclosure, it doesn't matter how many times we

6    ask for that document.  It's never provided.  The steps of the

7    securitization process, it's never provided, especially --

8              THE COURT:  But you say you haven't had anything to do

9    with these cases --

10             MR. ESPINOSA:  No.  I'm not talking about this, your

11   Honor.  I'm talking about cases in which I have an involvement

12   for, not these 39 cases, your Honor.  No, not at all.

13             Now, your Honor, there was also the argument that we

14   did not plan within the four corners that there was a

15   causation, and that that was caused by the racketeering acts

16   and so on.  A reading of eight, your Honor, clearly showed that

17   it is contrary to that.  We have pled everything, your Honor,

18   that is necessary for a RICO case; the racketeering, the

19   enterprise, the causation of damages and the damages.

20             In addition to that, your Honor, I may say there was

21   some argument with respect to it is not clear where is the

22   enterprise and who is the person.  Your Honor, I believe that

23   is totally clear, when you look at it from the way that we have

24   done so.

25             THE COURT:  What is the enterprise?

DB5ETRAC

1            MR. ESPINOSA:  Your Honor, we have an association in

2      fact, your Honor, and the persons --

3            THE COURT:  Who are the members of the association?

4            MR. ESPINOSA:  The members of the association, your

5      Honor, the member of the association that cooperated with them

6      are the particular individual trustee.  And, your Honor, and

7      naturally they're banks.

8            Let me, your Honor, clarify another thing to you in

9      the brief.  They say that under New York law the trustee, the

10     trustee can only be individually liable if they -- it cannot

11     be -- forgive my diction, your Honor.

12            THE COURT:  That's all right.

13            MR. ESPINOSA:  In citing *Jet Enterprise* case at the

14     beginning -- I believe it was in the first note that they had

15     in their brief -- they said that the trustee cannot be

16     individually liable.  That's absolutely incorrect by the same

17     case that they cite.  The case says that if it is not a

18     language in there in which he entered into this agreement, it's

19     stating that it was not -- in stating that he is not entering

20     into the agreement in his individual capacity, then he would

21     not be liable.  But if he have not avoided to say that he was

22     not entering into individual capacity, then they would be

23     liable.  So the trustee is liable, and the trust, your Honor,

24     in cases in which a trustee has to go survive as an entity

25     anyway.  So they have a new trustee for the formed trust.

DB5ETRAC

1          THE COURT:  As I read your papers, you're claiming

2     that these are individual violations of RICO by each of the

3     trustees and their --

4          MR. ESPINOSA:  Their servicers --

5          THE COURT:  Their servicers, their and whatever other

6     parties, that they are in agreement as to the individual -- as

7     to the RICO, and separate and apart from the other 36 cases.

8     So you've got 37 separate RICOs violations, as I understand it?

9          MR. ESPINOSA:  Your Honor, but in a concerted effort

10    found by the same methodology, and a methodology, your Honor --

11         THE COURT:  Maybe, but that's all theoretical.

12    There's not pled in the facts.

13         MR. ESPINOSA:  Your Honor, but it is a valid

14    inference, and a plausible one.  That is what the case of

15    *Bell v. Twombly* requires.

16         THE COURT:  But then don't you have to bring 37

17    different cases separate and apart --

18         MR. ESPINOSA:  With respect to the permissible

19    joinder, your Honor, I can cite to you, your Honor, other cases

20    on that, your Honor.  May I, your Honor?

21         Your Honor, there is the case of *Ronald Carye v. Long*

22    *Beach Mortgage Company*, which is 47 F.Supp. 2d, 2007, out of

23    the District of Massachusetts.  There is the case of *James H.*

24    *Hanley v. First Investor Corporation*, 151 F.R.D. 76, 1993.  In

25    both cases, your Honor, were the same methodology with the same

DB5ETRAC

1    method.  And we have here all of the plaintiffs all together

2    affected by the same methodology.  And the people that brought

3    it used the same methodology and are in the same field.

4           You can, your Honor, and you have the discretion to

5    join them purposefully for various reasons, your Honor:  One,

6    economy for the Court in the fact that the same expert can be

7    used, at the same situation, with respect to the application of

8    law and the same -- it's a limited group of defendants.  So,

9    your Honor --

10          THE COURT:  If they're not a limited group of

11   defendants.  But they're separate --

12          MR. ESPINOSA:  Instead of having 39 cases, your Honor,

13   you will have only one single case.

14          THE COURT:  We welcome that, of course.  But it might

15   be a little confusing to have all the different parties here.

16          MR. ESPINOSA:  I might say, your Honor, also that in

17   my brief I made a boo-boo when I was stating the basis of the

18   RICO predicate act in which I said I believe in 18, U.S.C.,

19   Section 391.  And they picked it up.  I was myself baffled when

20   I saw the answer.  And I said, I make mistakes and I'm sure

21   that I will make mistakes in the future, but I was concerned

22   391 -- I know about 891, what that would be, extortion in

23   credit transaction.  But it was not that.  It is that my four

24   looked like a nine, and it is in reality 1341, I believe it is

25   that -- which is so that it's clarified, your Honor, fraud and

DB5ETRAC

1    swindles.  And it's a long description of what it is in there,

2    which is one of the RICO predicate acts that we mentioned.  And

3    the main one, your Honor, because it's this complete fraudulent

4    makeup of facts.

5         Your Honor, these defendants didn't choose New York as

6    the home of the trust just by hazard.  They know what New York

7    law is, or they should have known, because they have learned

8    attorneys that we can see them here, belonging to big law

9    firms, which I respect.  I was once in one of them until I

10   decided to go back to the community and deal directly with

11   people.  I'm not implying that they do not deal with people,

12   but I mean the common man, the man in the street.  And they

13   know exactly what is the requirement of New York law.

14        Not only were all of the actions void because the

15   trustee violated New York law, but also under the finality law

16   of New York, these trusts were never formed.  And if you don't

17   have a trust, and you don't have a trustee and the power by

18   which the trustee could do anything, including going ahead and

19   exercising anything that that PSA, which is the constitution,

20   the indenture of the trust saying is void, is not -- he is the

21   trustee of a nonentity.

22        Another practical thing with respect to ratification,

23   your Honor, you know, these pools are divided in tranches.

24   There is not one -- any single or specific -- there is pieces

25   all over of the flow of payment that go into the trust.  And it

DB5ETRAC

1   is, ratification, possible, where you have then to look for

2   every one in the world -- Japan, anywhere that have paid for an

3   MBS -- and have them to get together and have 51 percent of

4   them to go to a particular -- is, your Honor -- not only is

5   that not -- almost, almost, I might say, impossible; but not

6   only that, your Honor, in the documents of the PSA, there are

7   not anyplace where they speak about ratification.  They speak,

8   your Honor, about having the opportunity of the beneficiary to

9   purchase the security to go ahead and sue them in case the

10   trustee violates the PSA.  Yes, they have that.

11          And, your Honor, we have here two clients, two streams

12   of beneficiaries, you might call it:  One to my client and the

13   one also to the beneficiary.  Because in reality, your Honor,

14   these trusts have not been formed, and that have all of this

15   problem of ultra vires violation and are strictly construed

16   that opens a mind-boggling situation vis-a-vis all the trusts

17   that they have formed.

18          Now, some of them, your Honor, have about 28 trillion

19   dollars.  And despite that, you know, we had the taxpayer to

20   give money to them in order for them to be saved, so that they

21   can foreclose on us fraudulent.  Your Honor, after saying all

22   of this, if your Honor, in examining the papers, finds that it

23   required a dismissal because of the defects to cure, we ask you

24   to give us the opportunity to cure.  We will cure, if that is

25   your decision, your Honor.

DB5ETRAC

1          THE COURT:  What are the circumstances that required

2     your filing an amended complaint?  What caused you to file an

3     amended complaint in the first place?

4          MR. ESPINOSA:  Your Honor, when I filed the First

5     Amendment, the first complaint, I sent letters to all the

6     others that it was going to be amended because I had to join

7     all the people.  But this is the first time that the complaint

8     is challenged, okay.  And that is, your Honor, the situation.

9     Your Honor, we have a wealth of information, a wealth of

10     information that we can then make very bulky.  Some of my

11     colleagues found it very good and concise.  We wanted to have

12     concise, concise but with sufficient facts that we will meet

13     the requirements of Rule 8(a).  And, your Honor, we believe

14     that we have done so.

15          But if your Honor considers that it's different, then

16     we ask the Court the opportunity for us to go ahead and do what

17     we have to do.  We have 39 people right there that should have

18     protection.

19          And forgive me for my passion.

20          THE COURT:  We always forgive that.

21          MR. ESPINOSA:  Well, your Honor, there was a time in

22     which I used to be with people that dedicated themselves to

23     the -- did work free.  Still I am one of those attorneys that

24     does a lot of pro bono work.  But you might say my passion is

25     to try to at least balance the -- we have a situation, horrible

DB5ETRAC

1    situation created precisely by dire methodology of

2    securitization.  In reality, it's so mind boggling, your Honor,

3    that, for example, in the case of Washington Mutual, 99 percent

4    of all of the notes never went even in the route of the trust.

5    And that created, naturally, the problem with investors.

6              Thank you very much, your Honor.

7              THE COURT:  Rebuttal?

8              MR. SHERMAN:  Thank you, your Honor.

9              During Mr. Espinosa's presentation, the Court touched

10   on several points that I'd like to revisit that I think are

11   very important to the disposition of the case.  One of the

12   points the Court made is that the Court didn't see why these

13   PSAs could not be amended by mutual agreement of the parties.

14   And, your Honor, I think that's exactly right.

15             To the extent that if the plaintiffs could

16   establish -- and we don't concede that they do, but if the

17   plaintiffs could establish that the trustees performed some act

18   that was not authorized by the PSAs, the beneficiaries of those

19   trusts -- that is, the investors, the certificate holders --

20   have the ability under New York law to ratify those actions.

21   And because they have the ability to ratify those actions,

22   those transfers, those transfers cannot have been void in the

23   first instance.  And if they're not void, then plaintiffs as

24   third parties have no standing to challenge them.

25             THE COURT:  What law are you citing?

DB5ETRAC

1          MR. SHERMAN:  Exactly, your Honor, the cases upon

2     which we rely for the point that beneficiaries can ratify

3     ultra vires acts by trustees begin at the bottom of page five

4     of our reply and continue on to page six.  The ECF page numbers

5     are actually seven and eight.  And that's the *Mooney* case out

6     of the appellate division, Third Department; the *Washburn* case

7     out of the appellate division, Second Department; the *Hein* case

8     out of the appellate division, Fourth Department; and we also

9     cite to New York Jurisprudence Second.

10          And then you know the *Erobobo* case, to the extent it

11     differs from those rulings of the appellate division, is simply

12     wrong, as recognized by this Court in the *Rajamin* case that was

13     decided this past March, by the *Karamath* case out of the

14     Eastern District and a couple other cases, which are just

15     diametrically opposed to *Erobobo*.

16          We heard from the plaintiffs that the suggestion that

17     somehow these particular trusts, as business related trusts,

18     are subject to some sort of different or special rules.  And,

19     your Honor, that's just incorrect.  The PSAs create New York

20     common law trusts which are not business entities.  They are

21     not separate entities at all.  A common law trust is a

22     relationship to property.  It does not create a separate legal

23     entity.  There is no document in a transaction involving a PSA

24     called a business indenture, or whatever it was, that plaintiff

25     called the document in the plaintiffs' papers.  There are no

DB5ETRAC

```
 1    separate rules that apply to these trusts.  The rules are set
 2    forth in Mooney and the other cases permitting beneficiaries to
 3    ratify trustees' ultra vires acts.
 4            The Court also pointed out that it was difficult to
 5    see how there is any injury resulting from securitization to
 6    the mortgagor; that the injury is, rather, to the investor, to
 7    the certificate holder.  And again, the Court is indeed
 8    correct, there are no injuries in this case caused by the
 9    securitization process.  And because there are no injuries to
10    the plaintiffs as such, because the plaintiff is -- the only
11    injuries in this case accrued to the investors to the
12    beneficiaries of these trusts, plaintiffs lack standing to
13    invoke those injuries.  And the cases for that point are also
14    cited in our brief.
15            The Court also said --
16            THE COURT:  In your reply brief?
17            MR. SHERMAN:  Excuse me, your Honor?
18            THE COURT:  In your reply brief or your brief?
19            MR. SHERMAN:  Our reply brief your Honor.  If the
20    Court can indulge me for a moment.  Yes, your Honor.  That
21    would be in our reply brief at page three of the McManus case
22    and the Cashman case.  Because just as plaintiffs are not
23    third-party beneficiaries of the PSAs, they're not
24    beneficiaries of the trust either, and under black letter
25    New York law have no standing to complain of ultra vires acts
```

DB5ETRAC

1    of the trustee.

2              With respect to the RICO claim, the Court observed,

3    where is the fraud here?  And again, the Court is correct --

4    and on the plaintiffs' best day -- and we don't think they're

5    right about this, but on the plaintiffs' best day, what we have

6    here is a disagreement over a technical provision of the PSA

7    with respect to what is the consequence under the agreement

8    with respect to the timing of delivery of certain documents.

9              And a couple of things about that.  Your Honor, I

10   understand that plaintiffs' counsel has represented that he's

11   going to deliver copies of the PSA to the Court.  I don't think

12   the Court needs to look at PSAs to conclude there is no fraud

13   here.  If there were facts making out a fraud, they would have

14   to be supplied in the amended complaint.  And they're not just

15   there -- excuse, me they're just not there.

16             And the second point is you know we pointed out in a

17   footnote in our reply that really this issue with respect to

18   the timing of the transfers is impossible to reconcile with the

19   language of at least the Tran PSA, and we believe all the other

20   PSAs as well, because the PSAs themselves contain language of

21   conveyance saying that they operate as of the closing date to

22   assign, transfer, sell, and otherwise convey to the trustees

23   the mortgage loans, and that the transfer of the paperwork that

24   plaintiffs' counsel is talking about occurs in connection with

25   that conveyance.

DB5ETRAC

1        So the PSA operates both to create a common law trust

2    to convey that intangible property to the trust and by

3    operation of the PSAs, all that is complete upon closing.  And

4    so there really isn't an issue to be had with respect to the

5    subsequent transfer of individual mortgage loan documents,

6    assignments or what have you.

7        THE COURT:  Are you saying that the provision in the

8    PSA creates the trust for -- in order to receive the mortgages

9    that are transferred to the trust by the investors?

10       MR. SHERMAN:  Yes, your Honor.  I don't think there's

11   any dispute that the intent behind the PSAs is to accomplish a

12   transaction in which the mortgage loans are conveyed to the

13   trustee in return for the certificates that then represent

14   those pooled mortgage loans and that are sold to investors.

15       THE COURT:  And what's the timing under the PSAs for

16   the transfer of those documents?

17       MR. SHERMAN:  Well, your Honor --

18       THE COURT:  Is there a time limitation, or is that

19   just for -- formed as a trust?

20       MR. SHERMAN:  There certainly are closing dates

21   established in the PSAs, but the argument that we're making is

22   that the mortgage loans are transferred by operation of the

23   PSA.  And the transfer of the paperwork that plaintiffs are

24   talking about the PSAs make very clear occurs in connection

25   with the transfer that's affected by the PSA itself.  And so

DB5ETRAC

```
1    the transfer of the indebtedness to the trustee and the
2    delivery of the certificates back to the depositor occurs by
3    operation of the pooling and servicing agreement itself.
4         THE COURT:  And the servicing agreement requires what
5    by the closing date?  Is that correct?  I'm trying to
6    understand your distinction, because I don't have the
7    documents.
8         MR. SHERMAN:  Sure.
9         THE COURT:  Neither sides provided them.
10        MR. SHERMAN:  Well, your Honor, I can't recall, I
11   mean, the particular language of the PSA at this moment, but
12   the portions that we've set forth in our brief are the portions
13   that operate as a present transfer of the intangible assets to
14   the trustees.  And they -- of course, the PSAs do contain terms
15   that establish the individual documents that are to be
16   transferred to a trustee or custodian in connection with that
17   transfer.  But the transfer itself occurs by operation of the
18   PSA as of the closing date, just as a matter of agreement.  I
19   think that's my point, your Honor.
20        Another point that the Court made is that, has this
21   issue with respect to the supposed insufficiency of these
22   transfers been raised at the state court level in each of these
23   individual foreclosures?  And again, the Court sees this on a
24   very important point, not only because it's a substantive flaw
25   in plaintiffs' claims, but also because it demonstrates why
```

40

DB5ETRAC

1    these plaintiffs are misjoined.  There are going to be, if the

2    case were to proceed, issues with respect to preclusion with

3    respect to many of these plaintiffs.  And the Court is going to

4    have to dig and delve into those issues and into the state

5    court processes with respect to each of the 37 different

6    mortgages that are joined in this case.  And it just goes to

7    show why there is no unitary transaction or occurrence or

8    series of transactions or occurrences in this case.

9            Your Honor, if the Court has no questions.

10           THE COURT:  All right.  Thank you.

11           MR. ESPINOSA:  Your Honor, can I, just very brief?

12           Your Honor, there is a distinction in the general law

13   of New York between fiduciary common trust and business trust.

14   It is defined in New York legislation that a business trust is

15   one in which shares on the trust will be distributed.

16           THE COURT:  I'm sorry.  I misunderstood.

17           MR. ESPINOSA:  Will be distributed -- I'm sorry, your

18   Honor.  Will be distributed.  There will be shares that will be

19   sold or people that would be participating in it.  And the

20   New York law of trust has been very clear in New York since

21   1935, in the case of *Burgoyne v. James*, 282 NY.S. 18 (1935).

22   They have recognized the existence of trust, business trust.

23   Your Honor, not only that, a business trust is also dealt with

24   in a different way, with respect to the instrument that created

25   it than a family trust.  And that is the case that I have cited

DB5ETRAC

1    to your Honor, *Vincent v. Putnam*, for which, also a 1928 case,

2    is still a good case, your Honor.

3         As I said before, all of these cases that are

4    mentioned, okay, they point to only the fiduciary situation in

5    which a ratification might be coming true, but not in the case

6    of the business trust.  That's the reason why it is not

7    construed as voidable, but as void, and that is --

8         THE COURT:  I'm sorry.  Not construed as?

9         MR. ESPINOSA:  As voidable.

10        THE COURT:  But as void?

11        MR. ESPINOSA:  But as void.  And that is the strict

12    application.

13        By the way, your Honor, some of the cases that they

14    cited, they have Texas Sixth Circuit cases.  The only case in

15    which New York law EPTL was considered is a case known as

16    *Saldivar*.  Let me cite it for you, your Honor.

17        THE COURT:  Isn't it in your papers?

18        MR. ESPINOSA:  No, it's not, your Honor.  That's the

19    reason why, your Honor, I was requesting to have a surreply.

20    Your Honor, it is *In Re Gilberto Saldivar v. JP Morgan Chase*

21    *Bank*.  And that is out of the Southern District of Texas in the

22    United States Bankruptcy Court.  And that is, your Honor, in

23    2013 WL 2452699.  And in that case the same conclusion with

24    respect to the strict application of 7-2.4 of the EPTL, similar

25    to *Glaski*, similar to all of them.

DB5ETRAC

1          When you have something that is an action of the

2     trustee, okay, that is void ab initio from the beginning, then,

3     your Honor, there is no -- none of these cases that have

4     analyzed it have come with a different decision.  All of the

5     other cases, your Honor, which I analyzed in there, including

6     cases going to Hawaii, like Abubo and all of that, they only

7     see the privity side of it in a contract, and they forget that

8     this is an entity and the PSA is not only a contract.  It is

9     the document that authorized the trust to do valid or not valid

10    things.

11         I must say another thing, your Honor.  I am very

12    surprised about this interpretation of the PSA.  The law of

13    New York says that a mere recital about we are going to create

14    a trust, and the trust is going to -- and a particular date we

15    have all of this matter done so that the trust funds are

16    delivered by the particular date, New York says that that

17    PSA -- the PSA doesn't create the trust itself.  It is the

18    document that, yes, governs the trust when it is created, and

19    it is the one that showed the relationship between the parties

20    in a contractual basis, but the trust is only created to the

21    delivery of the trust fund.

22         And in addition to that, your Honor, if you look at

23    each one of the PSAs, you will see that the date of the PSA is

24    different than the date of the closing.

25         THE COURT:  That's one of the reasons I want to see

DB5ETRAC

```
 1    the document.  So will I get a copy of the documents?
 2              MR. ESPINOSA:  I will send it to you, your Honor.  We
 3    will mail it, if you want, because it's the only way by --
 4              THE COURT:  I just want one of the trusts.  You say
 5    they're all similar, but I do want to see one of them and send
 6    a copy to the defense so that they can be satisfied that it is
 7    a representative document.
 8              MR. ESPINOSA:  Thank you, your Honor.
 9              THE COURT:  All right.  I will say that I'm a little
10    troubled by the citation to courts in Texas and Hawaii and
11    other places that aren't necessarily familiar with New York
12    law, because in other areas of the law I've found sometimes
13    that they're a little less than authoritative.
14              MR. GARBUTT:  Your Honor, Bernie Garbutt from Morgan
15    Lewis.
16              I just want to point out that Judge Swain has a case
17    that's basically right on point in the *Rajamin* case that's in
18    the Southern District.  And we did cite that in our brief,
19    along with other New York cases on this issue of whether a
20    borrower has standing to challenge a PSA.
21              MR. ESPINOSA:  Your Honor, and in the *Rajamin* case,
22    which I also examined, there is no discussion of the impact of
23    New York trust law on the validity of transfers or on the
24    formation of the trust.  There is no discussion of that.  It is
25    an issue only approached from the point of view of privity of
```

DB5ETRAC

1    contract.

2              THE COURT:  Okay.

3              MR. ESPINOSA:  Privity of contract.

4              THE COURT:  I see.

5              MR. ESPINOSA:  Now, the PSA is not simply a contract.

6    And that is the reason why *Glaski* and *Erobobo* and *Saldivar* that

7    I mentioned in there, among other things, look at this and say,

8    you are painting it too broad.  You are saying there is no

9    privity.  We go into that.

10             And when I spoke about privity being a matter of --

11   that is amenable to a lot to discovery and to all of those

12   things, it's because there is a wealth of other documents that

13   might bring the issue by the back door, but it's not the

14   central issue in our case.  We say New York applies strictly

15   the law to this trust, the trust of New York, the EPTL and the

16   New York trust law.  And that these are business trusts, and

17   they do not fall within the same category of the fiduciary

18   types; and that, therefore, every argument about voidable is

19   inapplicable here.

20             As a matter of fact, your Honor, and rightly so,

21   because that is the only true way to protect, in the complex

22   world of this world, the beneficiary.  And why?  Because later

23   on those beneficiaries might find themselves in a situation in

24   which they can say the actions of the trustee were against us

25   and not authorized by the PSA.

DB5ETRAC

1          There have been, your Honor, cases in which also the

2     beneficiary have raised the fact that the trustee acted

3     ultra vires in order to deny liability to the trust and to

4     themself.  Two of those cases, which I -- and, your Honor,

5     there's a *Dye v. Lewis* and *Dye v. Lincoln Rochester Trust*.  I

6     believe I have the cite, your Honor.  But in order to make

7     these -- I will mail it to you, your Honor, with my --

8          THE COURT:  You cited that case, didn't you, the

9     Lincoln -- maybe -- one of you did.

10          MR. ESPINOSA:  And I cite that, your Honor, not to the

11     proposition that they were business trusts, but to the

12     proposition, your Honor, that a violation of the trust

13     agreement can be raised as a defense to third party.  And it is

14     almost uncanny that you could use a violation of the instrument

15     in order to defend an action against the trust, and you cannot

16     use it in order to go against a trust when the -- or against

17     the trustee because they are individually liable when the

18     action of the trustee had been void and ultra vires.  It's

19     uncanny.

20          Your Honor, I come from a family in the Dominican

21     Republic of civil lawyers.  And these civil lawyers, we look at

22     the rights and claim and we say, is this ex contractus, which

23     means out of the contract?  Is this ex quasi contractus?  Which

24     will be, you know, what usually is known in equity.  It is out

25     of a delict or delict, which is meaning -- delict is an English

DB5ETRAC

```
 1   one, D-E-L-I-C-T, and it is quasi delicts.  Well, your Honor,

 2   we say, how is it possible that the trustee could commit a

 3   quasi-delicto, which means you may call it a tort in this case,

 4   fraud, and because -- and the fraud basis is the fact that he

 5   didn't have authority to do the particular act but did it with

 6   the representation that he had the authority -- and then you

 7   cannot bring a suit against them?  Something is wrong there,

 8   your Honor.  Something is fundamentally wrong.

 9             THE COURT:  All right.  Thank you very much.

10             No one has anything more to say?

11             MR. SHERMAN:  If I may just briefly, your Honor.

12             I just want to make sure that the Court is aware that

13   our rejection of the plaintiffs' argument with respect to the

14   EPTL is soundly based on two principles of New York law

15   reflected by New York cases:  The first, that the plaintiffs,

16   as nonbeneficiaries of the trust, lack standing to make that

17   argument.  And that's the Cashman and the McManus case on page

18   three of the reply.  And then the point that the transfers are

19   not void but nearly voidable.  And that's based on the Mooney

20   cases.  And the other case is on page six of our reply.

21             And to the extent that plaintiffs discuss Glaski,

22   Erobobo and Saldivar as separate cases, I think if the Court

23   looks at those cases, it will find that Erobobo, which came out

24   of the Supreme Court in Kings County, made a mistake.  And then

25   Glaski, for the proposition that these transfers are void,
```

DB5ETRAC

1   cites only *Erobobo* and then cites *Saldivar*, saying here's

2   another case that we're relying on *Erobobo*.  So really what we

3   have is not three cases but one case, is *Erobobo*, which is just

4   simply wrong in light of *Mooney* and the other cases that have

5   come out of the courts.

6          THE COURT:  Do they apply to business trusts, which

7   seems to be the crux of the plaintiffs' argument?

8          MR. SHERMAN:  Does *Mooney* and its other cases apply to

9   business trust?  I'm afraid I'm --

10          THE COURT:  Well, he says that, as I understand it,

11   this is a business trust and governed by the EPTL.

12          MR. GARBUTT:  For the purposes of standing, your

13   Honor, limited to that issue, the beneficiary of a trust is a

14   beneficiary.  And only a beneficiary has standing to challenge

15   the actions of the trustee.  And there's a very good reason for

16   that.  It's because when the trust instrument or the trust

17   itself is somehow violated or the trustee commits some act,

18   it's the beneficiary that is injured.  And here the plaintiffs

19   have not been injured.

20          You know, if the act can be ratified by the

21   beneficiary of the trustee, then the act is merely voidable.

22   And if the law tells us if the act is merely voidable, they do

23   not have standing to challenge it.  It's crystal clear.  I know

24   we did cite a lot of cases from other jurisdictions, but those

25   cases are doing the in-depth analysis of New York law that we

DB5ETRAC

1    also did in our brief.  And when you read them, and you read

2    our New York cases, you'll see that *Erobobo* was wrongly decided

3    and that New York courts treat these acts as merely voidable

4    because they can be ratified by the only parties that have any

5    standing here.  And that's the beneficiaries of the trust.

6         MR. ESPINOSA:  Your Honor, shortly.

7         Again, your Honor, I should say that at least the

8    representative of JP Morgan made an application to the Supreme

9    Court by letter of California to dispublish *Glaski*, and without

10   copying to me.  And I found by -- and referring to two cases

11   that JP Morgan has in which *Glaski* has been used as a -- in

12   support of the opponent to JP Morgan.

13        And one is another case, another case that -- the case

14   that they mentioned is this present case here before your

15   Honor.

16        THE COURT:  What do you mean?

17        MR. ESPINOSA:  Well, they went with a letter.  They

18   went with a letter --

19        THE COURT:  Why is that before me, the letter?

20        MR. ESPINOSA:  The reason why I bring this, your

21   Honor, is because I believe that those are the arguments that

22   they have made in that letter, too, and which I answered to

23   that letter, too, in respect to the same argument that I am

24   making here.

25        First, your Honor, New York applies strictly, like

49

DB5ETRAC

1   *Glaski.*  And you can look at the cases that I cited based in

2   New York.

3           THE COURT:  *Glaski* is another case, *Glaski*?

4           MR. ESPINOSA:  No.  *Glaski*, your Honor, is the case

5   that was in the Court of Appeals.  I have used *Glaski* here.

6   Maybe your Honor has not understood what I said.  Let me try.

7           JP Morgan, when we were engaged here, wrote a letter

8   to the Supreme Court, the attorney of JP Morgan to the Supreme

9   Court of California, asking that the Court of Appeals decision

10  of *Glaski* that is a published decision of the Court of Appeals

11  of California be depublished.

12          THE COURT:  Be what?

13          MR. ESPINOSA:  Depublicized, be taken out of

14  publication and put it as an unpublished publication.  And

15  cited one case, which I don't know who it is, and this case as

16  the basis, the reason why they had a basis to intervene before

17  the supreme court of California.  I learned only indirectly.

18  There was no copies sent to me, no anything of that nature.

19  Somebody in California let me know and provided me with a copy

20  of the letter, and we answered it.  We answer it, your Honor,

21  with argument that we have made here and my answer to what he

22  said.

23          First, the cases that he mentioned, your Honor, do not

24  touch on the application of EPTL.  And the cases that he

25  mentioned are –– that they analyzed in there fall within the

DB5ETRAC

1    group that are not for business trusts, your Honor.  And the

2    other cases that he cites are the cases that I have analyzed

3    similar to them, your Honor, on the matter that emphasizes the

4    privity of contract without emphasizing the impact of New York

5    Trust Law and New York EPTL.

6          THE COURT:  Are you an attorney of record in

7    California?

8          MR. ESPINOSA:  No, I wasn't, your Honor.  Neither were

9    they, okay?

10         And, your Honor, I may say also the following:  We are

11   also arguing that these trusts were never validly formed under

12   New York law because they never complied with the finality rule

13   of delivering the totality of the trust within the terms of the

14   PSA.  They never did it.

15         And not only that, your Honor, proof of that is the

16   fact that, in order to foreclose to do the actions of

17   foreclosures, you look around the nation, you will see that

18   each of these trusts will later on look for an assignment to be

19   done, to be filed only on the -- much more after the closing

20   date for the purpose of foreclosing and to have a standing in

21   foreclosure.

22         Your Honor, what happened is this:  You have the PSA

23   is stating that all of the trust fund had to be by the closing

24   date.  That includes all of the assignments.  And there is in

25   some of these PSA a period of grace that is deemed of about 30

DB5ETRAC

```
 1    days.  It is very important that that is so because if not,

 2    they lose their REMIC's character.  They will not be a trust of

 3    pool of REMICs in order to -- a trust with a pool of REMICs.

 4    That means Real Estate Mortgage Investment Conduit.  And, your

 5    Honor, they will lose all of this.  But when they decide to

 6    foreclose, your Honor, what they do is that then they go to

 7    MERS, MERS send them on assignment of the loan, your Honor.

 8    This securitization, it's a sham, because they didn't have the

 9    loan.  And that happens practically in every foreclosure that

10    they do.  There have been some cases that they cite in which

11    there was a different situation in which -- and they prevailed.

12    And they prevail because the securitization and everything was

13    done prior to the closing date during the period of the 90 days

14    that the REMIC has to be -- the trust has to be formed.

15          But here in reality, that is the most tremendous

16    evidence with respect to this trust never been formed.  It's

17    beyond the period of it.  And they are doing it throughout the

18    whole nation.  The problem is that usually people get a PSA,

19    and I have seen each one of these cases, and usually New York

20    trust appear anyplace.  They make the argument that it was

21    before -- after the closing date without really bringing up the

22    relevance of the closing date.  And naturally, the answer of

23    the Court is you have no privity of contract.  This is a

24    contract between all of them.  Why?  Because New York trust law

25    doesn't appear ever.  It doesn't appear ever.
```

DB5ETRAC

1              And in the cases that have been appealed, like the

2    *Bassman* case, then there is an analysis in which the trusts

3    that are analyzed are not business trusts at all in which the

4    ratification issue then is raised.  We say, your Honor, the law

5    as applied to business trusts, which is the definition that the

6    general association of law of New York has for this trust, and

7    the entity that is created by IRS 860 is a business trust, and

8    that business trust is strictly guided by the PSA to such a

9    degree that New York law even says that it cannot be changed by

10   contract.

11             THE COURT:  All right.  Thank you.  I guess you're all

12   worn out.  Needless to say, I have to reserve decision.  Thank

13   you very much.

14             (Adjourned)

15

16

17

18

19

20

21

22

23

24

25