**TOMAS ESPINOSA, ESQ.**
**Attorney at Law**
**8324 Kennedy Blvd. 2nd Floor**
**North Bergen, NJ 07047**
**Tel: (201) 223-1803/ Fax: (201) 223-1893**
**E-mail: drtomasespinosa@yahoo.com**

**N.J. Bar.**                                                            **N.Y. Bar.**

November 22, 2013.

**The Hon. Robert P. Patterson, Jr., U.S.D.C.J.**
United States District Court For
The Southern District Of New York
Daniel Patrick Moynihan US Courthouse
500 Pearl Street,
New York City, NY 10007

Re:     **Anh Nguyet Tran et_als   v. Bank of New York now known as Bank of New York**
        **Mellon by Merger and/or Acquisition et_als.**
        **Civil Action No. 13-cv-580 (RPP)**

Dear Judge Patterson:

      This office represents the Plaintiffs in the above referenced case.   This letter is to address certain assertions that were made during legal arguments by the attorneys representing the defendants that are contrary to positions that the defendants and or their authorized representatives had assumed in courts in other present active cases and also in published documents. We felt compelled to address the court because the documents provided as exhibits with this letter were obtained by plaintiffs' attorney only after the hearing of November 5, 2013 before your honor and they contain statements, arguments and case law and by Bank of New York Mellon's attorneys in other cases that are in direct contradiction to the statements made to Your Honor during the hearing arguments.  Please note that the plaintiff is not advancing the position that the duties of the Trustees are solely administrative as advanced in the said published documents that we include herewith for the court to examine.  We will list the documents and point out the relevance of the same in the context of the hearing that was held before Your Honor.

      We present this information of which we were not aware prior to and at the time of the hearing because we believe that the assertions made at the hearing by the defendants' attorneys are in fragrant contradiction to the positions that the defendants have publicly taken and we ask the Court to take Judicial notice of them because they are publications in the electronic net (Internet) at the web sites of the cited herein or position papers taken by the defendants through the association to which they belong to (American Bankers Association, Corporate Committee) or filings in Courts made by the defendants attorneys, by way of briefs). Let us describe each

document relevancy and how it contradicts the assertions made by the defendants' attorneys at the hearing:

    1. <u>The Trustee's Role in Asset-Backed Securities, by the American Bankers Association, Corporate Trust Committee, dated November 9, 2010.</u> (See **Exhibit # 1** attached hereto).

      This position paper is the authorized position of all the defendants which are members of the association (See Page 2 of the paper, Section Introduction).  In the paper, the association delineates the history of the PSA and calls it contrary to the defendants' attorney assertion before Your Honor the trust Indenture. Also in an attempt to limit the liabilities to the investors after a default the whole paper limits the obligations of the trustee to only the stated language of the PSA (the indenture) and it holds the position that it should be strictly interpreted. The court should note that while in defending themselves from the liability to the investors the defendants through the association hold a position that the PSA should be interpreted and applied strictly as to its language, and claim the New York law of Trust strict application to that subject the actions  of the trustee to the strict compliance with the indenture, however in respect to borrowers they assumed a position of not strict application of the Trust law of New York to the violations of the indenture.  In addition while the position paper in order to justify their position make a distinction between the other common law trust and those used for securitization (see in **Exhibit # 1** the historical analysis of the trustee indenture starting on Page 2) at the hearing the defendants held the position that there is not such distinction. In Page 10 of the paper Section VII, the Association states (and the defendants as members)

      " Contrary to recent suggestions, the trustee in an asset-backed securities transaction is not like the board of directors of a company and does not owe ABS investors fiduciary duties similar to those owed by owed by such directors.  Prior to default, the trustee duties are limited to those expressly set forth in the related pooling and servicing agreement, indenture or similar contract. The Court in the case, **In Re E.F. Hutton Southwest Properties II  V. Union Planters,** Stated that "the corporate trustee has very little in common with the ordinary trustee…. The trustee under a corporate indenture ….has his rights and duties defined, not under by the fiduciary relationship, but exclusively by the terms of the agreement. His status is more that of a stakeholder than one of a trustee" quotations omitted. The full citation of the case is **E.F. Hutton Southwest Properties II v. Union Planters, 953 F. 2d 963 (5th Cir. 1992).** The Association after stating in Page 11 of its position paper that New York common law governing trust indentures is consistent with the foregoing statements and after stating that Federal Courts have ruled similarly cited the case **Semi-Tech Litigation, LLC v. Bankers Trust Co., 353 F. Supp. 2d 460 (S.D.N.Y. 2005)** that stated "Under New York law, the pre default duties of an indenture trustee…. generally are limited to the duties imposed by the indenture. After an event of default, the trustee is held to the prudent man standard."  Unfortunately, for this line of reasoning, the PSA imposes on the trustee the duty to ascertain that the trust funds (i. e. all the notes, interim assignments, and mortgages) be delivered into the trust in the manner and at the time prescribed by the PSA and the PSA also prescribe that the trustee has to certify that this in fact occurred), failure to do these makes his acts void and the trust never formed.

Contrary to the affirmation of the defendants attorneys at the hearing, under **N.Y.GAS Section 2:NY CODE** – Section 2 definitions the term business trust means an association operating  a business under a written instrument or declaration of trust, the beneficial interest under which is divided into shares represented by certificates.  The term association is defined as a joint stock association or a business trust as defined above.  Moreover, **IRS Section 860** defines REMICS Trusts as entities for the purpose of applying the rules of taxation that prescribe the conditions for their exempt status.

The position stated in **Exhibit 1** to the present letter was also repeated by counsel to defendant Bank of New York Mellon ("BNYM") in its 14 pages supplemental memorandum filed on September 27, 2011 in a case known **The Bank of New York Mellon  V. Walnut Place LLC, et als,  Civil Case No. 11-cv-5988 (WHP)** , United District Court for the Southern District of New York, (See  **Exhibit # 2** attached hereto) in it the defendant stated that that the implied duties of the trustee are subsumed under the express duties spelled by PSA. (Page 1 of the Memorandum). It recognizes that the indenture is governed by New York law and that the PSA expressly disavowed implied duties.  The whole documents is and an argument to the strict adherence to the language of the PSA and the application of the language in the context of applicable New York law.  In Page 3 it also states that the terms of the trust agreement governs the conduct of the trustee.   The documents presented as exhibits herein are to illustrate the incompatible position of the defendants in respect the present case versus the position in the cases where they are sued by the investors.  In our present case the argument is that there is no distinction between the treatment under New York Trust Law to business trust as compared to other trust in respect to the effect of the trust indenture on the actions of the trustee and that the PSA is a mere contract.  This is advanced for the two prongs position of the defendants plaintiff had no privity of contract and were no Third Party Beneficiary to the PSA contract and New York Trust law is not ground to challenge the validity or not of the trustee acts, and secondly if New York trust is applicable then the act of the trustee in contravention of the PSA are voidable not void. While in the present case they seek to disengage the PSA from New York trust law and treated as a mere contract not to be strictly construed as to its effects under New York Trust law, in the cases  against the investor, they seek the strict interpretation of the PSA and its strict applicability under New York Trust Law.  This contradiction is not an innocent contradiction since it is coupled with an attempt to pass the buckle to the Servicers that are the contractual agents of the defendants and to avoid the consequences of the fraud connected with the transfer of loans into the trust that never occurred, the void assignments and the failure to form valid trusts that would validly possess and own the loans. This passing of the buckle is also two pronged one directed to shunning any responsibility for the quality of the loans (notice that unmentioned in this attempt is the failure to proper and timely deliver the complete trust funds to the trust) and two is the shifting burden of the responsibility on the subsequent efforts to enforce the defaulted loans on the servicers that acted as the agent of the Trustee by reducing them to independent contractors.

It is also important to realize that the Attorney General of New York filed a verified pleading in intervention in the application of BNYM for approval of a settlement agreement with multiple investors in the Supreme Court of New York County of New York (**Exhibit # 3** attached hereto) where the AG delineates the actions of BNYM that were knowing violations of New York Law (See **Exhibit # 3** starting at Page 3 Section B through Page 14) in those loans

coming from Countrywide and Bank of America ("BOA").   The parallel with the knowing violations alleged in the present case complaint not only against BNYM but the other codefendants cannot be simply independent parallelism that has a no culpable explanation based on market conditions and the competitive nature of the market.  The defendants are member of the same Association, (this is a very small club of trustees) use the same methodology, the same instrumentalities, committed knowingly the same violations, collected in the same manner payments under the false pretense of  trust duly formed, extracted modifications by the same methods, instituted in their name foreclosure actions without the right to do them, foreclosed on properties based on obligations they knew they did not validly possessed or owned all done in knowing violation of New York Law. (See **Exhibit # 3**).

Thanks for Your Honor's attention to this matter.

Respectfully submitted


**/s/ Tomas Espinosa, Esq.**
Tomas Espinosa, Esq.



TE/ve.


Via E-Mail

**Bryan Cave, LLP**
Cc:    Christine B. Cesare, Esq.                cbcesare@bryancave.com
Cc:    Scott H. Kaiser, Esq.                     scott.kaiser@bryancave.com
Cc:    Nafiz Cekirge, Esq.                       nafiz.cekirge@bryancave.com

**Dorsey & Whitney, LLP**
Cc:    Eric R. Sherman, Esq.                     sherman.eric@dorsey.com
Cc:    Christopher G. Karazheuzoff, Esq.         karagheuzoff.chris@dorsey.com

**Morgan, Lewis & Bockius, LLP**
Cc:    Bernard J. Garbutt, III                   bgarbutt@morganlewis.com
Cc:    Thomas J. Sullivan, Esq.                  tsullivan@morganlewis.com

**Hogan Lovells US, LLP**
Cc:    Brian S. McGrath, Esq.                    brian.mcgrath@hoganlovells.com
Cc:    Lisa J. Fried, Esq.                       lisa.fried@hoganlovells.com
Cc:    Allison J. Schoenthal, Esq.               allison.schoenthal@hoganlovells.com

# EXHIBIT # 1

**November 9, 2010**

# The Trustee's Role in Asset-Backed Securities
*—By the American Bankers Association, Corporate Trust Committee*

## Executive Summary

In this position paper, the Corporate Trust Committee is responding to current assertions that the obligations of trustees in asset-backed securities[1] ("ABS") are greater than the duties contractually undertaken by those trustees.

These assertions, which have been made by participants in the ABS market by investors, investment advisors, rating agencies and others[2], fail to recognize the legal limitations on the duties of ABS trustees and have been made in response to both disappointing ABS investment performance and market issues arising from the current economic crisis. Although ABS investment performance has been disappointing, particularly with respect to certain residential mortgage-backed securities, and there were numerous market issues which gave rise to the current crisis, it is the position of the Committee that the contractual role of the trustee was *not* a contributing factor to either the investment performance or the market issues which may have caused or affected it.[3] Moreover, in many instances, ambiguities or errors in the transaction documents governing impaired asset-backed securities have been construed in ways that were not contemplated or bargained for by the original transaction parties and that seek to alter the role and potential liability of trustees to a degree not warranted either by the contractual language or applicable statutory and common law.

As a basic principle, the Committee acknowledges the need for more clarity in transaction documents generally going forward. However, the Committee's position is that any issues that were neither contemplated by nor addressed in the documents governing current ABS transactions must be resolved in accordance with the legal contracts governing those transactions and generally accepted rules of contractual interpretation. Reliance on clear hindsight, even with the goal of protecting particular constituencies or investors generally, to impose duties retroactively on trustees that are clearly outside the range of duties undertaken in their contracts effectively abrogates those contracts and violates basic tenets of U.S. contract law.

---

[1] For purposes of this position paper, the term "ABS" will include residential and commercial mortgage-backed securities, collateralized debt and loan obligations and the securities issued by structured investment vehicles, by asset-backed commercial paper conduits and in other structured finance transactions backed by financial assets, whether involving fixed or revolving funding, static or dynamic collateral or funded or synthetic exposures,

[2] See, e.g., Moody's Investors Service, Inc., Structured Finance Special Report, "Moody's Re-examines Trustees' Roles in ABS and RMBS," February 4, 2003, and "White Paper on Reforming the Asset- Backed Securities Market," Association of Mortgage Investors, March 2010.

[3] See Fitch Ratings Ltd. Asset-Backed Securities Non-Rating Action Commentary, "Seller/Servicer Risk Trumps Trustee's Role in US ABS Transactions," February 24, 2003. ("Recently, ABS trustees have come under fire from some in the market who have suggested that performance issues for certain ABS transactions reflect failures by the trustees. Fitch Ratings believes this misses the mark. While the trustee can play an important role in an ABS deal, Fitch believes that unrealistic reliance on trustees increases the risk to investors by potentially masking other more important considerations when evaluating structured finance investments. Specifically, Fitch believes it is important to consider the critical role played by the seller/servicer in ABS transactions, which is heavily dependent on the stability of their business model and their financial viability. In addition, cash flow stresses should include appropriate servicing fee scenarios, and post-closing transaction performance and servicer financial health should be followed closely. Focusing of these key areas, in Fitch's view, is a more effective way for ABS investors to mitigate risk than any dramatic change in the trustee's role might provide.")

The first necessity for every debt security is certainty in its terms. For corporate and municipal debt securities this means clear drafting of the issuer's promise to pay. For asset-backed securities, this means clear drafting of the provisions which establish the trustee's security interest in the financial assets backing those securities and the provisions for converting payments due on the assets into payments to the related security holders. The duties performed by a trustee in connection with an issue of asset-backed securities (e.g., receiving data and collections from servicers, maintaining trust accounts, making calculations, remitting funds and distributing information) are integral to the terms of the asset-backed securities. Consequently, those duties should be explicitly set forth in the applicable transaction documents so as to establish clear expectations and avoid any misunderstanding of duties by investors or other interested parties. As transaction documents evolve to reflect enhanced roles for certain parties, (including trustees), as necessary to address emerging market issues, clear delineation of those roles and the attendant duties will be needed so that the terms of the new asset-backed securities will be unambiguous and not subject to misinterpretation.

This paper begins with an introduction of its authors, considers the historical development of the role of the indenture trustee and describes typical asset-backed securities transactions, including the parties who generally have the greatest knowledge of and control over the assets. It discusses in detail the limited role of the trustee in asset-backed securities transactions and how that role derives from the transaction documents. It further addresses mortgage loan servicing considerations within the context of the continuing issues in the mortgage market and misunderstandings by market participants of the limited role of ABS trustees.

## I.  Introduction

The Corporate Trust Committee (the "Committee"), a committee of the American Bankers Association, focuses on the role of banks in providing corporate trust products and services to corporate, institutional and governmental clients. Its purposes include member education, providing a forum for their concerns and representing their interests. The Committee currently is composed of representatives of thirteen major banking institutions that provide corporate trust services, including acting as trustees for asset-backed securities. Together, these institutions provide trustee services for over 98 percent of all asset-backed securities.[4] The Committee believes that the views expressed herein reflect the views of virtually all trustees for asset-backed securities.

*Purpose of This Paper.* This paper is an update to a White Paper on the role of the trustee in asset-backed securities transactions which was issued by the Committee in 2003. The goal of the Committee is to update and set in proper perspective the trustee's role in relation to ABS transactions, particularly within the context of the significant market changes which have occurred over the last few years, and to address certain market perceptions concerning the trustee's role which diverge from the traditional understanding of the trustee's contractual, statutory and common law duties. This paper also explores in greater detail the role of the ABS trustee as "owner" or "assignee" of individual mortgage loans or other financial assets held by the trusts.

## II.  Development of the Role of the Indenture Trustee

*Brief History.* The use of corporate trustees in the United States arose with railroad bonds in the nineteenth century. Extremely simple documents of a few pages developed over decades of use and litigation into long documents with extensive provisions that attempted to eliminate uncertainty as to

---

[4] Securities Industry and Financial Market Association data shows that approximately $2.4 trillion of ABS, including automobile, credit card, home equity, manufactured housing, student loans, equipment leases and CDO/CLO, was outstanding at the end of the first quarter 2010 and approximately $9.1 trillion of mortgage-backed securities, including agency (GNMA, FNMA, FHLMC, etc.), and other residential and commercial mortgage-backed securities, was outstanding at that time.

terms.  Trustees accepted only ministerial duties for the convenience of the issuer, such as authenticating and paying bonds. At the time nearly all bonds were bearer bonds, so few records were needed.  The terms of the bonds were largely contained in the bonds themselves.  The terms "indenture" or "deed of trust" were applied to the documents pursuant to which bonds were issued because they generally followed a trust format: the issuer granted interests in property to the trustee to secure the issuer's obligation to repay the bonds.  This style was adopted even where the debt was unsecured.  The issuer's general obligation to repay the bonds was granted in trust to the trustee for the benefit of the bondholders.[5]

*Trust Indenture Act of 1939.*  The first widespread test of corporate indentures came about with the Great Depression. Hearings in the 1930's by then SEC Commissioner William O. Douglas, among others, uncovered instances where a trustee's action or inaction resulted in harm to bondholders.[6]  In the reforming spirit of the times, it was felt that public investors needed more protections than the market place had provided them.[7]  As a consequence, the Trust Indenture Act of 1939 (the "Trust Indenture Act") was adopted.[8]  It imposes on trustees subject to the Trust Indenture Act, regardless of any contractual protections, the requirement that, after a default with respect to the indenture securities, the trustee must protect the interests of the holders with the same degree of care that a "prudent man" would use with respect to his own interests.[9]  Trustees could not be relieved from liability for their own negligence or willful misconduct.[10]  Nevertheless, trustees would not be liable "except for the performance of such duties as are specifically set out in such indenture"[11] and could "conclusively rely . . . upon certificates or opinions conforming to the requirements of the indenture."[12]

The Trust Indenture Act is applicable to non-governmental debt publicly sold in the United States, but not other debt, such as privately placed securities.[13]  Its provisions, which were required until 1990 to be quoted verbatim in the indentures to which it was applicable, form a core of boilerplate language that infuses indentures even where the Trust Indenture Act is inapplicable.  Some state statutes, such as New York's Streit Act and various state Blue Sky laws, have inspired the addition of similar boilerplate language in indentures to which the Trust Indenture Act is not applicable. The prudent man standard of care established in section 315c of the Trust Indenture Act is the industry standard for trustees post default for corporate, municipal and structured finance debt issues.  This standard has been in place for over 60 years and has served to guide the conduct of trustees in post default circumstances.  That standard elevates the trustee's responsibilities to a more proactive role post default to use the same degree of care and skill in exercising its rights as a prudent person would, under the particular circumstances, in order to enforce obligations and pursue remedies on behalf of the bondholders as provided for in the trust documents.  In certain private placements, the trustee may be more limited in its activities due to the required direction of private investors who wish to exert a higher degree of control and as reflected in the specific trust documents.  Such limitation of the prudent man standard is not the prevailing model for the majority of structured finance transactions.

*Model Debenture Indenture.*  In 1971, the American Bar Foundation published the Commentaries on Indentures (the "Commentaries").  It resulted from a long-term American Bar Association committee project representing issuers, underwriters, trustees and governmental interests. The Commentaries contained a model indenture derived from a long evolution in standardized indenture documentation that

---

[5] Smith, Chase and Morison, "The Trust Indenture Act of 1939 Needs No Conflict of Interest Revision," 35 The Business Lawyer 161, 163-63 (1979).  See generally American Bar Foundation, Commentaries on Indentures 4-10 (1971).
[6] Hearings Before Subcommittee of the Committee on Interstate and Foreign Commerce, House of Reps., 75th Cong., 3rd Sess., on HR 10292, April 25, 1938, at 30 *et seq.* (remarks of Commissioner Douglas concerning, among other things, hearings in which he had previously participated).
[7] See TIA (defined in note 6 *supra*), Section 302.
[8] Act of August 3, 1939, 53 Stat.1149, 15 USC Sections 77aaa-77bbbb, as amended (the "TIA").
[9] TIA, Section 315(c).
[10] TIA, Section 315(d).
[11] TIA, Section 315(a)(1).
[12] TIA, Section 315(a)(2).
[13] TIA, Section 304(b).

had become the prevailing influence on indenture drafting long before its publication.  Among many other provisions, the model indenture contained in the Commentaries included standard provisions on the rights, duties, obligations and immunities of the trustee.  These provisions were carefully crafted to provide the trustee with the protections customary in the financial marketplace without violating the Trust Indenture Act. They limited the duties of the trustee to those expressly stated (until default when the statutory prudent man standard became applicable), exonerated the trustee for all but its negligence or bad faith, provided for reliance by the trustee on various issuer and expert certifications and provided other protections.  These standard provisions appear in hundreds of thousands of indentures and similar instruments, including the documents relating to asset-backed securities transactions.

*The Reform Act.* The Trust Indenture Reform Act of 1990 (the "Reform Act")[14] remains the only substantive amendment to the Trust Indenture Act. The Reform Act, among other things, changed the time when a trustee's conflicting interests are judged for purposes of disqualification of the trustee.  Under the pre-1990 Trust Indenture Act, the existence of any of nine specified "conflicting interests" at any time while indenture debt was outstanding required cure or resignation by the trustee.  After the Reform Act, a "conflicting interest" exists only when default under the indenture is pending and one of the specified conflicts also exists.  The SEC proposed and Congress enacted this change because they believed that a trustee's pre-default role is only administrative.[15]  This change made disqualifying trustee conflicts applicable to a trustee at substantially the same time as the prudent man standard becomes applicable to the trustee. It implicitly recognizes that, before any default occurs under an indenture, a trustee has no duties under the indenture other than the duties it has explicitly undertaken to perform.

*The Trustee.*  The virtually universal inclusion in indentures of standard provisions protecting and exonerating the trustee reflects the economic realities of trustees' relationships to debt offerings.  Trustees are usually named late in the preparation of a transaction (with accordingly limited ability to negotiate terms) and are paid relatively small fees to act as trustees in transactions involving large sums of money.  A trustee's willingness to act is premised upon its documented understanding that the trustee can have no liability in the transaction except for its own negligence or willful misconduct in carrying out its prescribed duties or for breach of contract claims.  Thus, trustees require indemnification and a lien against trust assets for their expenses in enforcing the indenture and defending themselves against claims.

## III.  Asset-Backed Securities Transactions

*Brief History.*  Current asset-backed securities transactions (as distinguished from traditional mortgage indentures that granted physical security under mortgages mostly for railroads and utilities) developed in the 1980's from such predecessors as project finance, sale-leaseback and tax-exempt municipal financing.  The initial draftsmen were experienced with traditional indentures for corporate and municipal debt and the passive roles performed by trustees under those indentures prior to any default. However, certain structural features of asset-backed securities transactions, primarily the absence in most such transactions of an operating issuer, inclined the draftsmen to make the trustee's pre-default role more active.

*Structure.*  In a typical asset-backed securities transaction, a seller transfers receivables, securities or other assets in either of two ways. A trustee may receive the assets in exchange for pass-through certificates evidencing beneficial ownership interests in such assets.  Alternatively, a Delaware statutory trust or another limited purpose entity (a "special purpose vehicle" or "SPV") organized by the sponsor of the ABS transaction[16] may purchase the assets with proceeds from its notes or other debt

---

[14] Act of November 15, 1990, Pub. L. 101-550, 104 Stat. 2713.

[15] Senate Report 101-155, The Securities Acts Amendments of 1989, October 18, 1989, at 32-35 ("[T]he Commission has stated that, in the absence of default, the indenture trustee's duties are essentially ministerial . . . ." at 32).

[16] Regulation AB (see *infra* at footnote [17]) defines "sponsor" as the person who organizes and initiates an asset-backed securities transaction.  This person may be the seller.

instruments and pledge such assets to a trustee to secure the debt instruments.  The seller of the assets or the SPV may sell the certificates or debt instruments directly or through underwriters to investors.  A pooling and servicing agreement, trust indenture or similar agreement forms the basic document which sets forth the relationship among the parties and the assets.

*Sellers.*  In most asset-backed securities transactions, the seller (or originator, depositor or other sponsor) assembles the pool of financial assets backing the securities by purchasing them or arranging for them to be acquired. The seller then describes the financial assets in offering materials and sells the securities backed by them to investors. The seller, in conjunction with underwriters or private investors, determines the structure, drafts the documents and prices the transaction. The seller selects the other transaction participants, including the underwriter, if any, the servicer and the trustee.  It may also sell the securities to investors and it, or an affiliate, may act as servicer.   At the initiation of an asset-backed securities transaction, the seller will know more about the assets and structure of the transaction than any other participant.  In some cases the seller will have continuing obligations with respect to the pool of assets, such as an obligation to add or replace assets if the assets in the pool drop below certain value thresholds.  In other cases the seller will have no contact with the pool of assets once the transaction is closed.  The seller may benefit from the initial sale of the assets to the trust or SPV and from the sale of securities issued by the trust or SPV to investors, as well as from any ongoing relationships that the seller or its affiliates may have with the transaction.

*Underwriters.*  The seller may select one or more underwriters to purchase the asset-backed securities and resell them to investors.  Underwriters, their counsel and other experts conduct a "due diligence" review of the assets, the structure of the transaction and the parties involved to obtain comfort and protection under the securities laws that the prospectus or other sales document is accurate. In some cases the underwriter controls the seller of the assets and is primarily responsible for the structure and assets in the transaction. Underwriters sell the securities and then have no further relation to the transaction.  Consequently, they have little interaction with trustees.

*Servicers.*  The servicer is appointed as an independent contractor who performs its servicing obligations for the benefit of the transaction investors.  Servicer duties are specified in the applicable servicing agreement and generally are performed in accordance with certain accepted servicing practices (as defined under the agreement).  In connection with these duties, the servicer's fee is typically structured as a percentage of the outstanding balance of the asset pool.  Servicing duties are carried out either directly or through subservicers, and involves managing the underlying assets deposited with the trust or SPV in the asset-backed securities transaction.

The servicer typically collects all the income from the assets, enforces the assets as needed and may perform any evaluations needed to substitute assets.  Following the end of each collection period, as defined in the ABS transaction documents, the servicer reports to security holders (often through the trustee) information on collections and other summary information about how the assets are performing. This information is used to determine the payment stream to holders of ABS and the allocation of losses, if any. The servicer may also determine allocations of funds to reserves and/or to purchase additional assets. The trustee applies the funds delivered to it from the servicer, as instructed by the servicer and provided in the transaction documents, to pay interest and principal on the securities, to fund reserve accounts and purchases of additional assets, and to make other payments including fees due to the ABS transaction participants.

Additionally, as required by recent federal legislation, servicers evaluate and approve mortgage loan modifications, short sales and other default resolution strategies to mitigate losses in connection with defaulted assets.  To the extent enforcement of the assets involves a foreclosure action, the servicer undertakes these actions in the trustee's name as the secured party but is fully responsible for all associated activities including the engagement of counsel, eviction proceedings, property maintenance, and sale or disposition of properties following foreclosure.

Thus, in most asset-backed securities transactions, the seller and the servicer have more knowledge about and, in the case of the servicer, control over the assets, asset performance and the

transaction generally than any other transaction participant.  In many asset-backed securities transactions, the document may not contemplate any direct check on the performance of the seller or the servicer.  Transaction documents virtually *never* give the trustee any substantive oversight of the seller or the servicer and their activities other than to confirm the timely receipt by the trustee of certain remittances and reports from the servicer, including reports of independent accountants, and certifications in the forms required by the transaction documents. Additional oversight is not explicitly required of trustees and would necessarily be limited to matters that are readily ascertainable and verifiable on a cost and time sensitive basis. Importantly, the trustee typically has no duty under the transaction documents to make investigations on its own for the purpose of detecting defaults, fraud or other breaches.

If the servicer becomes insolvent or unable to perform, the trustee may be responsible under the transaction documents for the appointment of a successor servicer.  Some transaction documents contain specific provisions relating to "back-up" servicing, *i.e.*, appointing a specified successor servicer from the outset to take over servicing when succession becomes necessary.  These provisions range from "cold" back-up servicing, where the trustee agrees in the transaction documents to become the successor servicer (a servicer of last resort) unless another entity (appointed by the trustee when needed) accepts such appointment, to "hot" back-up servicing, where a successor servicer named in the transaction documents agrees to maintain back-up files throughout the transaction. In transactions where the trustee accepts the role of back-up servicer, the trustee typically relies upon arrangements with servicing units within its own institution or with third party providers to pre-arrange succession.

*Trustees.*  The trustee in an asset-backed securities transaction may perform various functions, including serving as indenture trustee, authenticating agent, issuing and paying agent, securities registrar and transfer agent and calculation agent with respect to the securities, custodian of the assets (on behalf of the issuer), analytics provider and back-up servicer. "Trustee" as used herein, unless otherwise specified, includes all such roles performed by the trustee in an asset-backed securities transaction (but not the role of servicer, back-up servicer or master servicer).

The trustee of an asset-backed securities transaction typically performs more numerous and complex duties than trustees for traditional corporate and municipal debt transactions. The asset-backed securities trustee's ability to accept these expanded duties within its role and compensation depends on the clear expression of such duties in the transaction documents and the applicability of the provisions thereof to properly limit the trustee's liability for their performance.

## IV. Regulation of Asset-Backed Securities

*Regulation AB.*  In December 2004, the Securities and Exchange Commission ("SEC") published comprehensive final regulations addressing registration, disclosure and reporting requirements for asset-backed securities.[16]  Among other things, the regulations require specific disclosure regarding ABS transaction counterparties in transactions registered with the SEC, including trustees, sponsors, depositors, issuing entities, servicers, originators and others.  Consistent with the economic reality of the trustee's role as being ministerial in nature, the regulations require only basic, limited, summary disclosure regarding the trustee.  Indeed, the SEC did not even propose a separate definition of "trustee," and following market commentary did not believe such a definition was necessary.

The limited disclosure for trustees stands in marked contrast to the *increased* disclosure that the regulations require for many other ABS transaction participants, including sponsors, issuing entities, servicers and related parties.  It also stands in particularly sharp contrast to the regulations' *new and materially higher* disclosure standards for significant obligors, credit enhancement providers and swap counterparties in ABS transactions due to the critical importance of these parties – as contrasted to the trustee – to the economic performance of transactions subject to the rule.

---

[16] *See* Securities Act Rel. No. 8518 (Dec. 22, 2004), available on the Internet at http://sec.gov/rules/final/33-8518fr.pdf.

At this writing, the SEC has proposed revisions to both Regulation AB and asset-backed securities generally  that would impose substantial changes in the offering process and disclosure and reporting requirements for ABS (the "Proposal").[17]  In a lengthy release that emphasizes the need for improved investor protection in the wake of the financial crisis, the SEC issued the Proposal because "[t]he recent financial crisis highlighted that investors and other participants in the securitization market did not have the necessary tools to be able to fully understand the risk underlying those securities and did not value those securities properly or accurately."  However, even though the Proposal is a direct result of the financial crisis and it substantially increases disclosure concerning pool assets, servicers, originators, cash flow models, repurchase demands, and other items, the Proposal requires no additional disclosure concerning trustees

## V.  The Asset-Backed Securities Trustee

*Transaction Documents.*  The principal document in most asset-backed securities transactions is a pooling and servicing agreement, indenture or similar contract governing the securities pursuant to which the securities are issued and the trustee serves. The transaction documents normally provide for events of servicer default, additional events of default ("acceleration events" in pooling and servicing agreements), and limits on enforcement rights only to rights against the assets dedicated to the asset-backed securities transaction (not against the seller) or performance obligations of contractual parties. Additional agreements may detail the roles of the servicer and other parties and may contain specified additional duties for the trustee.

The responsibilities of the trustee, as set forth in typical asset-backed securities transaction documents, whether a pooling and servicing agreement or an indenture, are narrowly circumscribed as to each role and are traditionally stated to be limited to those expressly accepted by the trustee.  These duties are ministerial in nature and do not require the trustee to verify, investigate or monitor the actions of the seller or the servicer (other than in instances of a breach or a default as further described below). Lastly, in tacit recognition that the trustee's duties are so circumscribed, asset-backed securities transaction documents usually provide for expert input from independent accountants or others in circumstances where information needs to be audited or verified and actions at the direction of specified requisite percentage of holders (contingent upon providing trustees with indemnity sufficient to cover such actions contemplated).  Trustees are virtually never required or invited to exercise independent discretion in the transaction documents.

Under Trust Indenture Act-qualified transaction documents, during the continuance of a default, the trustee must exercise its rights and powers under the transaction documents for the benefit of the holders of the asset-backed securities in the same manner that a prudent person would exercise such rights and powers for his or her own benefit.  Lastly, these provisions are generally only relevant to the extent the trustee has actual knowledge of a default (or a breach which, to the extent not cured, will mature into an event of default) and specific actions or remedies are clearly prescribed under the transaction documents.

*Basic Duties of the Trustee.*  In most asset-backed securities transactions, the roles and basic duties of the trustee are specifically detailed in the transaction documents and may consist of the duties for the following capacities.

1. As *assets custodian*, the receipt, safekeeping and release of the assets;

2. As *analytics provider*, the performance of certain, specified analysis and reporting of related data provided thereto;

---

[17]  The proposing release is available at http://www.sec.gov/rules/proposed/2010/33-9117.pdf.

3.  As *account custodian*, the receipt, maintenance and segregation of funds derived from the asset;

4.  As *paying agent*, the release of those funds as payments to holders and for other purposes; and

5.  As *trustee*, the holding of a lien on the assets for the benefit of holders, the circulation of certain information to holders, the exercise of certain remedies for the benefit of investors as specified and/or directed by a controlling majority and the replacement of the servicer.

Additionally, the trustee performs certain traditional duties in respect of the asset-backed securities (authenticating agent, registrar and transfer agent for the asset-backed securities issued under the indenture or pooling and servicing agreement). Although some of these tasks may be complex, they are all ministerial in nature and not discretionary. Trustees accept these duties in reliance upon provisions in transaction documents that limit trustee performance liability to negligence and bad faith, authorize trustee reliance on the servicer for all information and indemnify the trustee.

*Asset Custodian.*  The trustee usually is granted a security interest in or is the owner of the assets underlying the transaction for the benefit of the holders of the asset-backed securities.  The details of the interest and the trustee's duties in respect of it are described in the transaction documents.  The actual grant occurs pursuant to the transaction documents at the closing for the issuance of the asset-backed securities. In the case of physical assets or securities, the transaction documents usually require that physical possession be given to the trustee or registration of securities be made in the name of the trustee or its nominee. Where the assets are receivables, inventory or other property that may be impracticable for the trustee to hold, the transaction documents normally specify that the trustee's interest in such assets must be clearly indicated in the records of the seller or pledgor of the assets.  The quality of the security interest granted ("perfected", "first priority", etc.) and the "true sale" nature of any transfer of assets may be specified in the transaction documentation.  The trustee is not, however, expected to determine that a security interest of such quality has been established or that a "true sale" transfer has occurred.  Instead, the trustee is authorized by the transaction documents to rely upon legal opinions or other evidence to establish at closing that what it has been granted conforms to the documents. The trustee is also authorized to rely on future opinions and instructions from others (usually the servicer or the seller) to establish that the assets are being maintained so as to preserve the trustee's interests in the assets in accordance with the transaction documents.

The trustee may be obligated under the transaction documents to determine from time to time that the aggregate value of the assets bears a prescribed ratio to the amount of the debt outstanding or to perform other analytics on the assets.  The documents set forth precise valuation procedures and indices and other methods of valuation and authorize the trustee to rely upon specific sources of information. The trustee will instruct the seller or other responsible party to add assets if needed or may permit assets to be withdrawn if the amount held exceeds requirements.  In each case the trustee has authority to rely on specified information as to the value and ownership of assets being added or withdrawn.  The trustee may also require the substitution of new conforming assets for existing assets that have ceased to conform to the asset requirements for the transaction upon receiving notice of such failure to conform. Usually the seller or servicer will effect the substitution.  The trustee will be authorized to rely upon their representations that the substitute assets meet transaction requirements. In certain transactions there is a constant or periodic flow of assets through the trustee's custody or security interest.

*Accounts.*  The transaction documents usually specify a number of separate accounts in which the trustee is instructed to hold funds derived from specified sources. The servicer usually collects the funds from these sources and remits the funds to the trustee with instructions as to source and account application. Appropriately, in most asset-backed securities transactions, the trustee is authorized under the transaction documents to rely entirely upon the servicer as to the source and, usually, the allocation of the funds to particular accounts because the trustee has no independent means to investigate the servicer's information and instructions. The trustee's only duty is to keep the funds safe until their release is directed pursuant to the transaction documents by the servicer or upon the happening of an event, established by certification to the trustee.

*Payments.* The trustee for an asset-backed securities transaction releases funds from one or more accounts upon the terms of the transaction documents to pay holders, to pay transaction participants' fees and expenses and, in some cases, to pay the costs of acquiring new assets. The trustee or the servicer usually calculates payments to holders based upon the terms of the asset-backed securities. Often an asset-backed securities transaction involves several classes of holders who are entitled to payment at different levels of priority, with some entitled to payment on a particular day only if the funds then available exceed the amounts due to others having more senior interests. If the calculation requires information not known to the trustee, the transaction documents specify that in making the payment the trustee may rely upon information provided by other transaction participants.

*Reports.* The trustee usually provides monthly distribution reports to holders of securities, furnishes information or documents pertaining to the assets and performs tax reporting functions on distributions. In addition, in the case of publicly offered transactions, the trustee may file the periodic reports required by the Securities Exchange Act of 1934[17] on behalf of the trust, the SPV, the servicer or the seller.

*Replacement of the Servicer.* The transaction documents often make the trustee responsible for any needed succession of another entity to the role of servicer. The transaction documents usually provide precise circumstances when the trustee must remove the servicer, such as upon the servicer's bankruptcy or material breach of its covenants. Where the transaction documents task the trustee with the administration of servicer performance standards, most trustees require that such standards be set forth in a sufficiently clear manner that the trustee may reasonably administer them.

In cases where the transaction participants or rating agencies contemplate a higher risk of replacing the initial servicer, a designated back-up servicer is appointed at the initial closing of the transaction. The requirements of any such designated backup servicer vary depending on the servicer, transaction structure, asset class and other variables. In some instances the backup servicer will maintain redundant real time servicing information during the life of the transaction so that it is in a position to step in at any time. In other instances, backup servicers may only periodically receive and test back-up tapes of transaction information. The specific responsibilities of the backup servicer vary and are clearly outlined in the applicable servicing agreement.

While designated backup servicers are appointed on more transactions today than they have been historically, in many transactions servicer succession is not actively contemplated at closing. In such cases, the transaction documents provide that the trustee will appoint a successor servicer, if needed, or will act as the successor servicer itself until another entity accepts appointment. This arrangement is typically referred to as having the trustee act as the "servicer of last resort."

Trustees that do not wish to perform as successor servicer, following the termination of the initial servicer, may obtain an agreement from another entity that can and is qualified to act for them in order to take over servicing upon the trustee's request. This type of succession arrangement can function reasonably well when funds are set aside for transition expenses and the successor servicers' fees are adequate, or can be increased, to attract a successor servicer.

*Satisfaction and Discharge.* Trustees are required to confirm that the discharge of indentures upon the stated maturity of the securities issued thereunder or upon the delivery to the trustee of all such securities for cancellation complies with the requirements under the transaction documents. In connection with the discharge of an indenture, the trustee ensures it receives the appropriate officers' certificates from the issuer (and, if applicable, the co-issuer) and an opinion of counsel, each stating that all conditions precedent for the satisfaction and discharge of the indenture have been satisfied. Although the provisions governing satisfaction and discharge of indentures have remained very consistent over time, trustees have recently come under pressure to discharge indentures in cases where the collateral securing the bonds has been exhausted or liquidated before the stated maturity of the bonds, which remain outstanding.

---

[17] Act of June 6, 1934, 48 Stat. 881, 15 USC Sections 78a-78jj, as amended.

## VI.   Trustee as "Owner" or "Assignee" of Mortgage Loans

Mortgaged-backed securities ("MBS") often use pooling and servicing agreements, pursuant to which an MBS trustee holds formal title to loans for the benefit of MBS investors, calculates and processes securities payments, and takes certain specific actions on behalf of investors.  Although the trustee is the legal owner of record of the mortgage loans, the trustee does not own the loans for its own account or have an economic interest in the loans.  The beneficial owners of these mortgage loans are investors in the MBS securities, who typically are large institutions such as public and private pension funds, mutual funds and insurance companies.

As is the case with all other ABS, the role of the securitization trustees in MBS transactions is limited.  The trust instruments creating MBS securities and relevant law do not give the trustee any powers or duties with respect to foreclosure, maintenance, sale or disposition of properties that are collateral for the MBS securities.  Those powers and duties are conferred exclusively on loan servicers, who generally are appointed by the depositor or seller of the loans to the MBS trust.  In fact, depending on the particular trust and pool, the trustee may have no or very limited information on either the borrower or the status of the mortgage loan. While foreclosure and any legal action with respect to trust properties must be brought in the trustee's name as the legal owner of the loans, foreclosure activity and the post-maintenance, sale and disposition of the trust properties are managed entirely by the loan servicers. Although any claims against the trust must be brought against the trustee as the trust's legal representative,   these cases usually are defended either by the original lender who sold the loans to the securitization trust or by the loan servicer.  Occasionally, trustees will become actively involved in this type of litigation in a representative capacity to protect the interests of the investors who are beneficiaries of the securitization trusts.

As previously discussed, the servicer is an independent contractor and is fully responsible and liable to the investors in connection with the performance of all loan servicing obligations as outlined in the applicable transaction documents.  Trustees are not responsible for overseeing or monitoring the performance of the servicer other than with respect to confirming its timely receipt of remittances or any periodic reports or certificates in the required form.  To enable servicers to independently perform their servicing obligations, trustees are generally required to provide powers of attorney to the servicer and execute documents as requested or directed by the servicers in furtherance of any loan servicing activities.  In the event a servicer fails to perform its obligations, and such ongoing failure constitutes a servicer event of default, trustees may take additional action to pursue remedies on behalf of or as directed by the investors.  Absent a servicer default, the trustee has no authority to direct or approve loan servicing activities.

## VII.   Response to Assertions of Market Participants on Role of the
##           Trustee

Contrary to recent suggestions,[19] the trustee in an asset-backed securities transaction is not like the board of directors of a company and does not owe ABS investors fiduciary duties similar to those owed by such directors.  Prior to a default, the trustee's duties are limited to those expressly set forth in the related pooling and servicing agreement, indenture or similar contract.[20]  The court in the case, *In re*

---

[19] See "White Paper on Reforming the Asset-Backed Securities Market," Association of Mortgage Investors, March 2010.
[20] See, e.g., Trust Indenture Act (TIA), § 315(a)(1), 15 U.S.C. § 77ooo(a)(1); the Commentaries § 6-1, at 248 ("Before the occurrence of an event of default, Subsection (a) [of section 315 of the TIA] requires the Trustee to perform only those duties that are specifically set forth in the indenture."); and J. Spiotto, Defaulted Securities: The Prudent Indenture Trustee's Guide, at IV-13 (1990).

*E.F. Hutton Southwest Properties II v. Union Planters,*[21] stated that "the corporate trustee has very little in common with the ordinary trustee. . . .   The trustee under a corporate indenture . . . has his rights and duties defined, not by the fiduciary relationship, but exclusively by the terms of the agreement.  His status is more that of a stakeholder than one of a trustee" (quotation marks omitted).[22]  New York courts have held that New York common law governing trust indentures is consistent with the foregoing interpretations of the TIA,[23] and federal courts applying New York law have ruled similarly.[24]  The court in the case, *Semi-Tech Litigation, LLC v. Bankers Trust Co.,*[25] for instance, stated that, "[u]nder New York law, the pre-default duties of an indenture trustee . . . generally are limited to the duties imposed by the indenture. After an event of default, the trustee is held to the prudent man standard" (citations and quotation marks omitted).[26]

Occasionally, the duty of an asset-backed securities trustee to take or refrain from taking a particular action is unclear, either because the related asset-backed securities documents are vague regarding the action to be taken or who is to take the action or because the permissibility of the action is in doubt under the terms of the documents (or for some other reason).  In many recent instances, such ambiguities have prompted trustees to interplead participants in collateralized debt obligation and other asset-backed securities transactions as to which disputes have arisen, or, where the allocation of deal assets was not contested, to file for declaratory judgment. Trustees also have been concerned about their duty and ability to accept and cancel securities gratuitously surrendered by collateralized loan obligation investors for the purpose of affecting the timing and amounts of payments on other securities comprising part of the same issuance.[27]  Additionally, trustees have been concerned about their duty and ability to cooperate in residential mortgage loan modifications under the Home Affordable Modification Program ("HAMP") established by the Secretary of the United States Treasury pursuant to the Emergency Economic Stabilization Act[28] and to treat principal forborne on those mortgage loans or reduced in amount pursuant to HAMP as a realized loss under the related asset-backed securities transaction documents.[29]

Ambiguities or gaps in ABS transaction documents have, as described in Part III above, prompted transaction participants to induce trustees to undertake duties traditionally carried out by other parties, such as servicers. In most if not all such transactions, trustees are neither appropriately compensated for doing so, nor required to acquiesce under the terms of the contract. More importantly, in contrast to other transaction parties, trustees (within their trust departments) generally do not have (nor should be presumed to have) the expertise to make substantive business decisions. Rating agencies and investors should consider alternative means of mitigating the potential for servicer mistake or malfeasance, including the appointment of a backup servicer, a credit risk manager or verification agent.[18]

Although it would not be possible to resolve any uncertainty by interpreting the transaction documents to contain terms beyond the plain meaning of their existing provisions, trustees may determine the appropriate course of action in reliance upon the standard provisions protecting and exonerating them and the principle, established in the cases discussed in  the immediately preceding paragraph and in other cases along similar lines, that the trustee's duties are limited to those expressly set forth in the transaction documents prior to a default.

---

[21] 953 F.2d 963 (5th Cir. 1992).
[22] Id at 969.
[23] See *AG Capital Funding Partners, L.P. v. State Street Bank and Trust Co.,* 11 N.Y.3d 146 (2008).
[24] *Elliott Associates v. J. Henry Schroder Bank & Trust Co.,* 838 F.2d 66, 71 (2d Cir. 1988).
[25] 353 F. Supp. 2d 460 (S.D.N.Y. 2005).
[26] Id at 472.
[27] Moody's Investors Service, Inc. Structured Finance Special Report, "Challenges in Interpreting CDO Documentation: A Summary of Moody's Observations and Responses from 2009," Part II (Note Cancellations in CLO Transactions), pp. 2 - 3, March 2010.
[28] Pub. L. 110-343.
[29] See Letter of American Securitization Forum to Michael S. Barr, Acting Under Secretary for Domestic Finance and Assistant Secretary of the United States Department of the Treasury, dated December 19, 2009.
[18] See **The Report**—*Another View* infra.

**VIII.  Conclusion**

Trustees provide important services to the asset-backed securities marketplace under the terms of the applicable transaction documents.  These duties are ministerial in nature and scope which is consistent with the limited information given to trustees and the level of compensation paid to trustees for those services.  Parties in the marketplace generally have accepted the scope of the trustee's role since the enactment of the Trust Indenture Act, as evidenced by consistent terms in the relevant agreements over the last 70 years.  The limited role of the trustee has not, in fact, been a contributing factor to disappointing ABS investment performance and was not a contributing factor in the current financial crisis.

Accordingly, efforts to expand the interpretation of transaction documents to retroactively impose additional non-contractual duties on trustees in light of the financial crisis are misguided.  Indeed, such efforts, which may be seen as substantially altering the scope of the trustee banks' role and the extent of their potential liability relative to the holders of ABS, are not legally enforceable and would constitute unsafe and unsound practices for the banking industry.   Absent trustees' consent, the reinterpretation of contractual terms to impose on trustees duties not contemplated at the inception of an ABS transaction is financially unfair to trustees, legally indefensible as an abrogation of their right of contract and destructive to the necessary certainty of debt terms that underlies successful capital markets.

# EXHIBIT # 2

Wednesday, September 28, 2011
6:37 PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the matter of the application of

THE BANK OF NEW YORK MELLON (as
Trustee under various Pooling and Servicing
Agreements and Indenture Trustee under various
Indentures) *et al.*,

     Petitioners,

          -against-

WALNUT PLACE LLC *et al.*,

     Intervenor-Respondents.

**11-cv-5988(WHP)**

**SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF
THE BANK OF NEW YORK MELLON'S
<u>MOTION TO REMAND</u>**

DECHERT LLP
Hector Gonzalez
James M. McGuire
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

MAYER BROWN LLP
Jason H. P. Kravitt
Matthew D. Ingber
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Petitioner
The Bank of New York Mellon*

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

RESPONSE TO THE COURT'S QUESTIONS ....................................................1

I.   The Trustee's Only Implied Duties Are to Avoid Conflicts and to Perform
     Ministerial Acts With Due Care. .................................................................1

II.  The Implied Duties May Be Modified, But Not Waived.....................................3

III. Relevance of Implied Duties to CAFA's Securities Exception. ..........................4

     A. A Claim Need Not Relate Exclusively to Securities-Based Rights, Duties, and
        Obligations...........................................................................................4

     B. The Implied Duties Here Are Ones "Relating to or Created by or Pursuant to"
        Securities.............................................................................................5

        1.  The Securities Exception Is Not Limited to Contractual Duties.............................6

        2.  Any Implied Duties Here Are Created by the Securities Instruments. ...................9

CONCLUSION...................................................................................................10

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*AG Capital Funding Partners, L.P. v. State Street Bank &Trust Co.,*
11 N.Y.3d 146 (2008)..........................................................................................................2

*Bankers Ins. Co., v. DLJ Mortg. Captial. Inc.,*
No. 8:10-CV-0419-T-27EAJ, 2010 U.S. Dist. LEXIS 124147 (M.D. Fla. Oct. 8,
2010)....................................................................................................................................2

*Beck v. Mfrs. Hanover Trust Co.,*
218 A.D.2d 1, 12 (N.Y. App. Div. 1995) ...........................................................................3

*Boles v. Lanham,*
17 Misc. 3d 1106(A), No. 17059/06, 2007 WL 2850987 (N.Y. Sup. Ct. Sept. 25,
2007), *aff'd,* 55 A.D. 3d 647 (2d Dep't 2008)....................................................................3

*Carmona v. Bryant,*
No. CV-06-78-S-BLW, 2006 WL 1043987 (D. Idaho Apr. 19, 2006)..............................7, 8

*ECA Acquisitions, Inc. v. Mat Three LLC,*
No. 09 Civ. 590 (AKH), 2009 U.S. Dist. LEXIS 75501 (S.D.N.Y. May 1, 2009)..............9

*Elliot Assocs. v. J. Henry Schroder Bank & Trust Co.,*
838 F.2d 66 (2d Cir. 1988)..................................................................................................2

*Estate of Pew v. Cardarelli,*
527 F.3d 25 (2d Cir. 2008)..................................................................................................6, 7, 9

*Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.,*
603 F.3d 23 (2d Cir. 2010)..................................................................................................5, 6–8

*In re Textainer P'ship Secs. Litig.,*
C05-0969 MMC, 2005 WL 1791559 (N.D. Cal. July 27, 2005).........................................8, 9

*Ind. State Dist. Council of Laborers Pension Fund v. Renal Care Group, Inc.,*
No. Civ. 3:05-0451, 2005 WL 2000658 (M.D. Tenn. Aug. 18, 2005)...............................9

*Logerfo v. Trustees of Columbia Univ.,*
No. 6674/04, 2011 WL 2518557 (N.Y. Sup. Ct. June 1, 2011) ..............................................9

*Meckel v. Cont'l Res. Co.,*
758 F.2d 811 (2d Cir. 1985).................................................................................................2

*N.Y. State Med. Care Facilities Fin. Agency v. Bank of Tokyo Trust Co.,*
163 Misc. 2d 551 (Sup. Ct. 1994), *aff'd,* 216 A.D.2d 126 (N.Y. App. Div. 1995)..................3

*Puglisi v. Citigroup Alternative Invs. LLC,*
08cv9774(NRB), 2009 WL 1515071 (S.D.N.Y. May 29, 2009)...........................................9

ii

## TABLE OF AUTHORITIES
### (continued)

Page(s)

### CASES (CONT'D)

*Rubin v. Mercer Ins. Group, Inc.,*
  Civil Action No. 10-6816 (MLC), 2011 WL 677466 (D.N.J. Feb. 15, 2011).............................9

*Rusyniak v. Gensini,*
  629 F. Supp. 2d 203 (N.D.N.Y. 2009).......................................................................................3

*Sankel v. Spector,*
  8 Misc. 3d 670 (Sup. Ct. 2005), *aff'd* 33 A.D. 3d 167 (1st Dep't 2006) ...............................10

*Williams v. Texas Comm. Trust Co.*
  No. 05-1070-CV-W-GAF, 2006 WL 1696681 (W.D. Mo. June 15, 2006)..............................9

### STATUTES

15 U.S.C. § 77ooo(a)(1).............................................................................................................2

28 U.S.C. § 1332(d)(9)(C)......................................................................................................4, 5

### OTHER AUTHORITIES

Jeffrey A. Schafer, 48 Cal. Jur. 3d *Partnership* § 228 (updated 2011) ...........................................8

RESTATEMENT (SECOND) OF TORTS .............................................................................................9

RESTATEMENT (THIRD) OF TRUSTS................................................................................................3

## INTRODUCTION

We respectfully submit this supplemental memorandum to address the Court's questions concerning whether the Trustee has non-contractual duties and the relevance of those questions to CAFA's securities exception. 9/21/11 Tr. at 67. The questions are:

- **"Does Bank of New York as trustee have any duties other than those spelled out in the PSAs?"** *Id.* Yes, in general a trustee has implied duties, although here, any duties that would otherwise be imposed by implication on BNYM are subsumed by express contractual duties.

- **"If so, what is the source of those obligations?"** *Id.* New York common law.

- **"Does New York law, that is, New York common law, impose nonwaivable duties on trustees like Bank of New York Mellon?"** *Id.* Yes, the same implied duties referenced above. Those duties can be modified, but not waived.

These implied duties do not place this action outside CAFA's securities exception. The Trustee's petition in this Article 77 proceeding is based on its rights and duties under the PSAs; moreover, under Walnut's own theory, the "persons" who brought this action are persons who owe their very existence to the PSAs. Without those securities instruments, there would be no Trusts, no Trustees, no trust assets, no claims against Countrywide, no Settlement, and no Article 77 proceeding. The ruling that the Trustee seeks in its petition is based solely on whether its determination to agree to the settlement was a proper and reasonable exercise of its power and authority provided for in the securities instruments: the PSAs. And as we explain below, the distinction between express and implied duties is not relevant to CAFA's securities exception.

## RESPONSE TO THE COURT'S QUESTIONS

### I.   The Trustee's Only Implied Duties Are to Avoid Conflicts and to Perform Ministerial Acts With Due Care.

Of the 530 Trusts, 513—nearly all of them—are New York common-law trusts. For the seventeen others, BNYM serves as indenture trustee for securities issued by Delaware statutory

trusts.   Those Indentures are governed by New York law.   Indenture § 11.13.   Both the

Indentures and the PSAs expressly disavow implied duties.  PSA § 8.01(i); Indenture § 6.01.  For

both types of trusts, the answer to the Court's questions is the same.   Neither is subject to a

general fiduciary duty, and only two duties are implied by law for either type of trust: (1) the

duty to avoid conflicts, and (2) the duty to perform ministerial duties with due care.[1]

New York law imposes two extra-contractual duties on trustees.   The first is the duty to

avoid conflicts:  "under state common law, the duties of an indenture trustee are strictly defined

and limited to the terms of the indenture, although the trustee must nevertheless refrain from

engaging in conflicts of interest."   *Elliot Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838

F.2d 66, 71 (2d Cir. 1988) (citations omitted).[2]   Second, "an indenture trustee owes a duty to

perform its ***ministerial*** functions with due care."   *AG Capital Funding Partners, L.P. v. State*

*Street Bank & Trust Co.*, 11 N.Y.3d 146,  157–59 (2008) (emphasis added).   The important

distinction here is that, unlike with respect to the traditional duty of due care, this duty applies

---

[1]      Some cases also suggest that after an event of default, "the indenture trustee's obligations
come more closely to resemble those of an ordinary fiduciary."   *Beck v. Mfrs. Hanover Trust
Co.*, 218 A.D.2d 1, 12 (N.Y. App. Div. 1995).  But those cases emphasize that "[t]he trustee
must in the postdefault context act prudently, but only in the exercise of those rights and powers
granted in the indenture."  *Id.* at 13 (this "relatively minor change in the legal landscape, if
change it is," leaves the "trustee's obligation . . . still circumscribed by the indenture.").  Here,
the Events of Default are strictly defined, and none has occurred.   Further, *Beck*'s "prudent
person" standard merely duplicates the contractual standard in Section 8.01 of the PSAs.

[2]      Although the Trust Indenture Act ("TIA") applies to the Indentures for the Delaware
trusts, it does not change the calculus.  Section 315(a)(1) of the TIA provides that an indenture
trustee "shall not be liable except for the performance of such duties [prior to an event of default]
as are specifically set out in [the] indenture."  15 U.S.C. § 77ooo(a)(1).  Applying the TIA, the
Second Circuit has held that "so long as the trustee fulfills its obligations under the express terms
of the indenture, it owes the debenture holders no additional, implicit pre-default duties or
obligations ***except to avoid conflicts of interest***."  *Elliot Assocs.*, 838 F.2d at 71 (emphasis
added); *see also id.* (explaining that the trustee was not required to act "over and above the duties
and obligations it undertook in the indenture"); *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d
Cir. 1985) ("Unlike the ordinary trustee, who has historic common-law duties imposed beyond
those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and
obligations are exclusively defined by the terms of the indenture agreement.").

2

only to the trustee's "basic, non-discretionary, ministerial tasks." *Bankers Ins. Co. v. DLJ Mortg. Capital Inc.*, 2010 U.S. Dist. LEXIS 124147, at \*17 (M.D. Fla. Oct. 8, 2010). By contrast, the terms of the trust agreement—not common law—govern the trustee's duty with regard to non-ministerial and discretionary functions. *See, e.g., N.Y. State Med. Care Facilities Fin. Agency v. Bank of Tokyo Trust Co.*, 163 Misc. 2d 551, 557-59 (N.Y. Sup. Ct. 1994), (duties to monitor bonds, tender bonds following redemption call, and provide notice of redemption were "purely ministerial and administrative and thus involved the exercise of no discretion" and were subject to standard of due care), *aff'd*, 216 A.D.2d 126 (N.Y. App. Div. 1995).

## II.   The Implied Duties May Be Modified, But Not Waived.

Under the *Restatement of Trusts*, there are no duties that cannot be modified. *See* RESTATEMENT (THIRD) OF TRUSTS § 78(1) (trustee has duty to administer trust "[e]xcept as otherwise provided in the terms of the trust"); *id.* cmt. c(2) ("even the vital fiduciary duty of loyalty is a *default rule* that may be modified by the terms of the trust"). The *Restatement* further provides, however, that implied duties cannot be waived entirely. *See id.* § 78 cmt. c(2) ("to some extent the duty of loyalty involves (as do other duties) more than default law—that is, that there are limits to the settlor's freedom").[3]

---

[3]   Whatever non-waivable implied duties the Trustee may have, they are subsumed by express contractual duties. For example, the contracts themselves impose a duty to act in "good faith" (PSA §§ 8.01(iii), 8.02(ii)), a standard that encompasses the avoidance of conflicts. *See Boles v. Lanham*, 17 Misc. 3d 1106(A), No. 17059/06, 2007 WL 2850987, at \*1 (N.Y. Sup. Ct. Sept. 25, 2007) ("A trustee must act in good faith in the administration of a trust . . . and avoid any circumstances whereby the trustee's personal interest will come in conflict with the interest of the beneficiaries."), *aff'd*, 55 A.D.3d 647 (N.Y. App. Div. 2008); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 224 (N.D.N.Y. 2009) (duty of "fidelity and good faith" encompassed "avoid[ing] self-dealing, as well as situations in which a fiduciary's personal interests conflicts with the interests of those owed a fiduciary duty"). In addition, the contracts provide that they shall not be construed to relieve the Trustee from liability for negligence" (PSA § 8.01), a statement that encompasses the duty of due care. In other words, any implied duties are subsumed by—and therefore would be duplicative of—the express duties contained in the contracts.

3

### III.   Relevance of Implied Duties to CAFA's Securities Exception.

Even assuming *arguendo* that implied duties were somehow at issue in the Article 77 proceeding, that still would have no effect on the application of CAFA's securities exception here.  A claim is not outside the scope of the securities exception merely because it touches, however tangentially, on rights, duties, and obligations that a securities instrument creates through implication rather than express statement.  To the contrary, the exception on its face *includes* "fiduciary duties" that arise from securities.

The Trustee's Article 77 petition—for a determination that the Trustee acted within the bounds of reasonableness in entering into the Settlement—easily qualifies for the securities exception:  it relates to rights and duties expressly stated in the securities instruments, and, to the extent it may be said to relate to implied duties, those have been created by or pursuant to those instruments.  Indeed, the PSAs and indentures create not only the rights and duties at issue, they create the trusteeships that Walnut seeks to characterize as 530 plaintiffs needed to qualify for mass action treatment.  Walnut thus cannot fairly deny that all the rights and duties even potentially at issue are rights and duties "relating to or created by or pursuant to any security"; hence, the CAFA securities exception applies directly to this proceeding.

### A.   A Claim Need Not Relate Exclusively to Securities-Based Rights, Duties, and Obligations.

The securities exception applies to

> any class action that solely involves a claim—
> * * *
> (C) that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security . . . .

28 U.S.C. § 1332(d)(9)(C).  A request for a finding that the Trustee acted reasonably in settling claims against Countrywide undeniably fits this description.  Its power to litigate and settle those claims comes directly from Sections 2.01(b) and 2.04 of the PSAs—if the PSAs did not require

4

Countrywide to repurchase non-conforming loans and grant the Trustee the right to enforce that obligation, those rights and duties would not be implied by law. Because the "claim . . . relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to a[] security," and the "action solely involves" that one request, the inquiry should end there.

Critically, the word "solely" does not modify "relates" (as in "a claim that relates [solely] to the rights . . . "). It modifies "involves." In assessing the securities exception's applicability, the question is whether a case "solely involves" a claim that falls within the exception, not whether each claim solely "relates to" rights, duties, and obligations described in the exception. As the Second Circuit explained in *Greenwich*, "the phrase 'solely involves' ensures that federal jurisdiction under CAFA cannot be defeated by ***adding a claim*** that falls within a § 1332(d)(9) exception to a class action complaint advancing one or more ***other claims***." *Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 32 (2d Cir. 2010) (emphasis added); *see also id.* at 31 ("If Congress had intended [the exceptions to CAFA] to apply only to class actions that involve no legal issues extraneous to the primary claim, they would have used language that was more clearly limiting."). In other words, the exception is applied on a claim-by-claim, not duty-by-duty, basis. If a claim "relate[s] to" qualifying rights, duties, or obligations, that is enough to qualify for the exception; it makes no difference if the claim also relates to rights, duties, or obligations which were not created by or exist pursuant to a security.

### B. The Implied Duties Here Are Ones "Relating to or Created by or Pursuant to" Securities.

The securities exception mandates remand here because the only arguably applicable implied duty—to avoid conflicts—is created by a security.

5

1.  The Securities Exception Is Not Limited to Contractual Duties.

The exception applies to claims that relate to rights, duties, and obligations "relating to or created by or pursuant to" any security.  It is not limited to rights, duties, and obligations created *in* a security. Unsurprisingly, then, no case holds that claims relating to duties that are implied from securities instruments are outside the exception.

The Second Circuit's decision in *Cardarelli* supports this point.  *Cardarelli* concludes that the securities exception applies both "to suits that seek to enforce the terms of instruments that create and define securities, *and* to duties imposed on *persons who administer securities*," distinguishing those from claims under state anti-fraud statutes for the marketing of a security. *Estate of Pew v. Cardarelli,* 527 F.3d 25, 33 (2d Cir. 2008) (emphasis added).  The latter category applies here: the Trustee, among other things, collects payments from Countrywide and distributes them in accordance with a prescribed priority, putting it squarely within the set of "persons who administer securities"—indeed, the entire purpose of the Article 77 proceeding is to facilitate the Trustee's ability to administer the securities.  Moreover, *Cardarelli* says nothing to suggest that its reasoning is limited to expressly *contractual* duties; it seems unlikely that the Second Circuit, or for that matter, Congress, was unaware that trustees, bailees, agents, and similar "persons who administer securities" all have duties implied in law.   The express reference to "fiduciary duties" in the statutory language demonstrates definitively that the exception is not limited to contractual duties.

As for *Greenwich*, its conclusion that the "focus of the inquiry is on the source of the right" (603 F.3d at 29) was in response to the argument that the exception does not apply unless "the certificate holders are . . . themselves parties to the PSAs" (*id.*)—the distinction that the *Greenwich* court drew had to do with where the right comes from, not who seeks to enforce it. And any "right that *arises from* an appropriate instrument" would qualify.  *Id.* (emphasis added).

6

Like *Cardarelli*, *Greenwich* does not hold—or even suggest—that the applicability of the securities exception depends on whether the rights are expressly defined within the four corners of an instrument or are implied-in-law as a result of the same instrument.

The *Greenwich* court's use of the phrase "holders as holders" reinforces that conclusion. Any duty owed by the Trustee to the Certificateholders is a right owed to "holders as holders"— certainly not to "holders . . . as purchasers"—regardless of whether it is characterized as contractual. *Id.* The court in *Carmona v. Bryant* addressed precisely this issue. The defendant argued that "[s]ubsection (C) [*i.e.*, the securities exception] would cover [only] cases where the 'terms of a particular security . . . create . . . duties that are fiduciary in nature.'" No. CV-06-78-S-BLW, 2006 WL 1043987, at *2 (D. Idaho Apr. 19, 2006) (quoting defendant's brief). In support, the defendant "cite[d] cases where the fiduciary duties were created by the terms of the security." *Id.* But the court decisively rejected the notion that the securities exception is limited to duties created in the "terms of a particular security":

> [The defendant's] reading, while recognizing that subsection (C) applies to fiduciary duties "created by" securities, ignores the additional language that it applies also to fiduciary duties "relating to . . . or pursuant to any security." These additional terms broaden subsection (C)'s applicability beyond those cases where the duty is "created by" the security. Here, Carmona relies entirely on his ownership of Albertson's common stock to bring this action— he alleges no interest that would allow him to pursue this case other than his stock ownership. Thus, his claim "relates to" or is "pursuant to" a security as required by subsection (C).

*Id.* (citations omitted). Accordingly, the court held that claims for breach of fiduciary duty against corporate directors fell within the exception, even though fiduciary duties were not expressly stated in the terms of the security. *Id.*

The presence of extra-contractual defenses and collateral issues does not defeat the applicability of the securities exception. As the Second Circuit observed in *Greenwich*, "[a]lmost any securities claim under state law will necessarily 'involve' defenses—such as

7

statutes of limitations—and collateral issues—such as state contract law."   603 F.3d at 31.
Indeed, in *Greenwich* itself, one of the defendants was not even a party to any securities
instrument; instead, it was alleged to be liable only under state alter ego law.   Nonetheless, that
was held to be a collateral issue that did not take the claim out of the exception.   To conclude
otherwise would destroy the securities exception:  Every contract is subject at least to the implied
covenant of good faith and fair dealing—but for good reason, neither *Greenwich* nor any other
case suggests that a claim under that covenant, let alone the mere presence of that implied duty,
would somehow pull the case outside of the securities exception.

CAFA's explicit reference to "fiduciary duties" is also a strong clue to the meaning of
"duties" and "created by."   Even though the Trustee here is not a fiduciary, Congress's
specification of "fiduciary duties" as an example forecloses interpreting the term "duties" to
exclude implied duties.   Neither the text nor the legislative history excludes duties merely
because they are also implied by law  (particularly where, as here, they are also set forth in the
securities instruments).   Nor is that how the exception has been interpreted—courts have
consistently held that claims for implied-in-law fiduciary duties are within the exception.   That
was the case both in *Carmona*, discussed above, and *In re Textainer Partnership Securities
Litigation*, in which the court considered claims for breach of fiduciary duty against general
partners of various partnerships.   No. C05-0969 MMC, 2005 WL 1791559, at *1 (N.D. Cal. July
27, 2005).   The partnerships were organized under California law (*see* Fourth Am. and Consol.
Class Action Compl. ¶ 11, *available at* 2006 WL 2702773), which imposes a non-waivable
fiduciary duty on general partners. *See* Jeffrey A. Schafer, 48 Cal. Jur. 3d *Partnership* § 228
(updated 2011).   The court held that the implied-in-law, non-waivable "fiduciary duty alleged to

8

have been breached . . . is one 'relating to or created by or pursuant to' a 'security.'" *Textainer*, 2005 WL 1791559, at *6.[4]

        2. Any Implied Duties Here Are Created by the Securities Instruments.

    Unlike the universally applicable duty not to commit fraud that was at issue in *Cardarelli*, any implied duties on securities trustees necessarily are "created by or pursuant to" (and also "relat[e] to") the securities.  It is well established that a trustee relationship, for example, is consensual.  *See Logerfo v. Trustees of Columbia Univ.*, No. 6674/04, 2011 WL 2518557, at *2 (N.Y. Sup. Ct. 2011) ("Mere reposal of one's trust or confidence in a party, however, does not automatically create a fiduciary relationship; the trust or confidence must be accepted as well."); *Sankel v. Spector*, 8 Misc. 3d 670, 678 (N.Y. Sup. Ct. 2005) ("one named as a trustee in a trust instrument who has not accepted the fiduciary office cannot be compelled to act as such") , *aff'd* 33 A.D. 3d 167 (N.Y. App. Div. 2006).  Thus, even though fiduciary "liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary," such liability "***results from the relation***."  RESTATEMENT (SECOND) OF TORTS § 874 cmt. b (emphasis

---

[4]    *See also Ind. State Dist. Council of Laborers Pension Fund v. Renal Care Group, Inc.*, No. Civ. 3:05-0451, 2005 WL 2000658, at *1 (M.D. Tenn. Aug. 18, 2005) ("The causes of action alleged, based upon Delaware state law, are broadly breach of fiduciary duties and self-dealing"; "It seems clear to the court that any class action solely based upon breach of fiduciary duty in connection with a security is, indeed, a 'carve out' from the Class Action Fairness Act."); *Williams v. Texas Comm. Trust Co.* No. 05-1070-CV-W-GAF, 2006 WL 1696681, at *3–*5 (W.D. Mo. June 15, 2006) (claims for breach of fiduciary duty, constructive trust, and accounting against indenture trustee all within exception); *Rubin v. Mercer Ins. Group, Inc.*, Civil Action No. 10-6816 (MLC), 2011 WL 677466, at *4 (D.N.J. Feb. 15, 2011) ("The Complaint 'relates to' the rights, duties, and obligations created by virtue of Plaintiff's ownership of Mercer stock, in that both claims asserted pertain to the alleged breach of fiduciary duty").

    *Compare ECA Acquisitions, Inc. v. Mat Three LLC*, No. 09 Civ. 590 (AKH), 2009 U.S. Dist. LEXIS 75501, at *5 (S.D.N.Y. May 1, 2009) ("by alleging that defendants falsely advertised the investment funds, the complaint goes beyond alleging mis-management of the funds, thereby ruling out the exception provided in section 1332(d)(9)(C)"); *Puglisi v. Citigroup Alternative Invs. LLC*, 08-cv-9774(NRB), 2009 WL 1515071, at *1–*3 (S.D.N.Y. May 29, 2009) (same).

9

added).  Hence, any duties imposed by law upon the Trustee are being imposed on a contractual relationship, meaning that the duties are "created by or pursuant to" the securities contracts.

Further, as noted at the outset, if there are "100 or more persons" in this action, as Walnut posits, these "persons" are the various "capacities" of The Bank of New York Mellon.  These "persons" would not even exist without the PSAs, let alone have duties, implied or otherwise.  In fact, none of the parties—BNYM, the Certificateholders, or Countrywide—would have any relationship if not for the PSAs.  The notion that those parties have "rights, duties (including fiduciary duties), or obligations" to each other that are not "relat[ed] to or created by or pursuant to" those contracts is untenable.

## CONCLUSION

For all of the foregoing reasons, the Court should grant the Motion and remand the proceeding to state court.

Dated:   New York, New York
         September 27, 2011

                              s/Matthew D. Ingber
         DECHERT LLP          MAYER BROWN LLP
         Hector Gonzalez      Jason H.P. Kravitt
         James M. McGuire     Matthew D. Ingber
         1095 Avenue of the Americas    1675 Broadway
         New York, New York 10036       New York, New York 10019
         (212) 698-3500                 (212) 506-2500

                    *Attorneys for Petitioner*
                    *The Bank of New York Mellon*

10

# EXHIBIT # 3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the matter of the application of

THE BANK OF NEW YORK MELLON (as Trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures),

Petitioner Counter-Defendant,

-and-

BlackRock Financial Management Inc. (intervenor), Kore Advisors, L.P. (intervenor), Maiden Lane, LLC (intervenor), Maiden Lane II, LLC (intervenor), Maiden Lane III, LLC (intervenor), Metropolitan Life Insurance Company (intervenor), Trust Company of the West and affiliated companies controlled by The TCW Group, Inc. (intervenor), Neuberger Berman Europe Limited (intervenor), Pacific Investment Management Company LLC (intervenor), Goldman Sachs Asset Management, L.P. (intervenor), Teachers Insurance and Annuity Association of America (intervenor), Invesco Advisers, Inc. (intervenor), Thrivent Financial for Lutherans (intervenor), Landesbank Baden-Wuerttemberg (intervenor), LBBW Asset Management (Ireland) plc, Dublin (intervenor), ING Bank fsb (intervenor), ING Capital LLC (intervenor), ING Investment Management LLC (intervenor), New York Life Investment Management LLC (intervenor), Nationwide Mutual Insurance Company and its affiliated companies (intervenor), AEGON USA Investment Management LLC, authorized signatory for Transamerica Life Insurance Company, AEGON Financial Assurance Ireland Limited, Transamerica Life International (Bermuda) Ltd., Monumental Life Insurance Company, Transamerica Advisors Life Insurance Company, AEGON Global Institutional Markets, plc, LIICA Re II, Inc., Pine Falls Re, Inc., Transamerica Financial Life Insurance Company, Stonebridge Life Insurance Company, and Western Reserve Life Assurance Co. of Ohio (intervenor), Federal Home Loan Bank of Atlanta (intervenor), Bayerische Landesbank (intervenor), Prudential Investment Management, Inc. (intervenor), and Western Asset Management Company (intervenor),

Petitioners,

-against-

THE PEOPLE OF THE STATE OF NEW YORK by ERIC T. SCHNEIDERMAN, Attorney General of the State of New York,

Intervenor Counter-Plaintiff,

for an order pursuant to CPLR § 7701 seeking judicial instructions and approval of a proposed settlement.

Index No.
651786/2011

Assigned to:
Kapnick, J.

**VERIFIED PLEADING IN INTERVENTION**

For his pleading in intervention pursuant to CPLR 401, 1012, 1013, and 1014, proposed Intervenor Counter-Plaintiff the People of the State of New York by ERIC T.

SCHNEIDERMAN,  Attorney General of the State of New York, states and alleges upon information and belief as follows:

## INTRODUCTION

1.      In this proceeding under CPLR Article 77, Bank of New York Mellon ("BNYM," or "the Trustee"), the trustee for 530 New York trusts ("the Trusts") comprising hundreds of billions of dollars in residential mortgage-backed securities, seeks the Court's approval of a sweeping settlement of claims against the creators of those trusts (the "Proposed Settlement"), Countrywide Home Loans, Inc. and Countrywide Financial Corporation (collectively "Countrywide") and the servicers of the trusts, Bank of America ("BoA") or affiliated entities.[1]

2.      The claims at issue arise from a massive collapse in value of the mortgage loans held by the trusts.  This collapse resulted from widespread misconduct both in the origination of mortgage loans and in the creation and administration of the Trusts, all causing grave harm to borrowers, investors and to the integrity of the securities marketplace.

3.      The New York State Attorney General intervenes pursuant to his statutory and common-law authority to safeguard the welfare of New Yorkers and the integrity of the securities marketplace.  Thus, while the other investors that have or may become parties to this proceeding stand only for their own interests, the Attorney General by law is charged to protect the interests of all New York investors and the marketplace more broadly.

---

[1]      On January 11, 2008, BoA agreed to acquire Countrywide Financial Corporation (the parent company of Countrywide Home Loans) in a reverse triangular merger.  The transaction closed on July 1, 2008, and on October 6, 2008, BoA announced that Countrywide would transfer all or substantially all of its assets to unnamed subsidiaries of BoA.

4.      The facts available at this time raise serious questions about the fairness and adequacy of the Proposed Settlement, as to both matters of procedure and substance. As to procedure, the Trustee's duty to negotiate the settlement in the best interests of investors in the trusts has been impaired because the Trustee stands to receive direct financial benefits under the Proposed Settlement.   As to substance, the Proposed Settlement seeks to compromise investors' claims in exchange for a payment representing a fraction of the losses suffered and for provisions governing mitigation of losses that are non-binding and may well prove to be illusory.

5.      The New York State Attorney General seeks to ensure that a fair and comprehensive resolution of all claims is reached and that no proposed settlement is approved absent adequate compensation to all injured parties.

6.      In addition, the Attorney General alleges that BNYM's conduct, both specifically as to the negotiation of the Proposed Settlement and more generally as to the performance of its duties of trustee, has violated its fiduciary duty to investors, as well as the Martin Act (General Business Law Article 22-A) and Executive Law § 63(12).

## I.      **BACKGROUND**

7.      On June 29, 2011, BoA (which bought Countrywide in early 2008) announced a settlement with BNYM, the trustee for numerous trusts created by Countrywide, including the 530 trusts covered by the Proposed Settlement.  On or about the same day, BNYM commenced the instant Article 77 proceeding, seeking "an order, among other things, (i) approving the Proposed Settlement, and (ii) declaring that the

Proposed Settlement is binding on all Trust Beneficiaries and their successors and assigns."[2]

8.   In its petition, BNYM describes the Proposed Settlement as resolving a number of claims against Countrywide and BoA, including:

o   Countrywide's failure to comply with its representations and warranties in the governing agreements creating the trusts, known as Pooling and Servicing Agreements or PSAs.

o   Countrywide's and BoA's breaches of those agreements' requirements that the servicers maintain adequate mortgage files and correct any deficiencies in those files.

o   Countrywide's and BoA's overcharging of fees and other costs for their inadequate recordkeeping and other services.

9.   To resolve these and related claims, the Proposed Settlement contains three principal elements: a cash payment, changes to loan servicing methods (including loan modification and loss mitigation programs), and provisions regarding the cure of mortgage file deficiencies.[3]

o   The cash payment is intended to compensate investors for losses from non-performing loans.  BoA and/or Countrywide agree to pay $8.5 billion to investors, allocable among the trusts according to a formula based on the past and estimated future losses suffered by each of the trusts.[4]

o   The changes to servicing methods encompass (among other things) a loss-mitigation program authorizing BoA/Countrywide to evaluate individual

---

[2]      Trustee Petition at ¶ 16.
[3]      Proposed Settlement at ¶¶ 3, 5, 6.
[4]      Settlement ¶ 3.

borrowers' eligibility and suitability for a variety of modification programs or for other remedies in lieu of foreclosure, although these loss-mitigation provisions do not obligate BoA or Countrywide to undertake any specific loan modifications or prescribe any standards according to which loan modifications must be extended.

o The cure provisions propose procedures under which BoA/Countrywide will perform, and BNYM as trustee will monitor, the reconstruction of otherwise deficient mortgage files and restore the rights to collateral underlying the trusts' certificates.

10.     As this Court is aware, only 22 investors directly participated in the negotiation and formation of the proposed settlement.  Several groups of investors proposing to intervene as respondents have raised multiple objections to the Proposed Settlement's adequacy and the Trustee's conflicts of interest in negotiating the Proposed Settlement.

## II.     THE INTEREST OF THE NEW YORK STATE ATTORNEY GENERAL

11.     The New York State Attorney General has both common-law *parens patriae* and statutory interests in protecting the economic health and well-being of all investors who reside or transact business within the State of New York.  *See People ex rel. Spitzer v. Grasso*, 11 N.Y.3d 64, 69 n.4 (2008) ("[C]ourts have held that a state has a quasi-sovereign interest in protecting the integrity of the marketplace."); *State v. 7040 Colonial Road Associates Co.*, 176 Misc. 2d 367, 374 (N.Y. Sup. Ct. 1998) ("[T]he Attorney General is empowered not only to protect the investing public at large from misleading statements and omissions in connection with the sale of securities, but also to seek redress on behalf of individual investors who have been the victims of Martin Act

violations."). The Attorney General also has an interest in upholding the integrity, efficacy, and strength of the financial markets of New York State, as well as an interest in upholding the rule of law generally. *See People v. Morris*, 2010 WL 2977151, at *13 (N.Y. Sup. Ct. July 29, 2010) ("State Blue Sky securities acts such as the Martin Act represent considered legislative judgments of individual States to preserve the honesty and therefore investor confidence and the efficacy of the securities and capital markets.").

12. As described below, the Attorney General believes that the Proposed Settlement is unfair to trust investors, many of whom are New York residents. Many of these investors have not intervened in this litigation and, indeed, may not even be aware of it. The Pooling and Servicing Agreements ("PSAs") that govern the creation and administration of the Trusts permit such participation only by investors who individually or jointly hold a twenty five percent or greater interest in the trust, typically representing hundreds of millions of dollars.

13. The Attorney General's investigation of BNYM to date reveals that BNYM breached its duties to the Trusts' investors in violation of the common law of the State of New York, engaged in repeated fraud and illegality in violation of Executive Law §§ 63(1) and 63(12), and breached General Business Law §§ 352 *et seq.* (the "Martin Act") by engaging in improper conduct in connection with the sale of securities.

## A. THE PROPOSED SETTLEMENT IS UNFAIR AND INADEQUATE

14. On the facts currently available, the Attorney General believes that the Proposed Settlement is both procedurally and substantively flawed.

15. In negotiating the Proposed Settlement, BNYM labored under a conflict of interest because it stands to receive direct financial benefits under the deal as currently structured. As trustee, BNYM owed and owes a fiduciary duty of undivided loyalty to

6

trust investors, and its direct financial interest in the consummation and approval of the settlement violates that duty of strict loyalty.

16.     The Proposed Settlement advances BNYM's own financial interests most clearly by broadening its rights to indemnification for losses to investors or others. Under the PSAs,[5] Countrywide agreed to indemnify the Trustee for certain claims arising out of the Trustee's duties.  (*See* Settlement ¶ 16 & Exhibit C (agreement between Countrywide and BNYM).)  But as BNYM concedes in its petition here (Petition ¶¶ 78-81), Countrywide has inadequate resources.  A side-letter agreement appended to the Proposed Settlement expands the benefit of the PSAs' indemnification provisions by having BoA, now Countrywide's parent company, expressly guarantee the indemnification obligations of Countrywide.  In addition, the Proposed Settlement expands the indemnification to cover BNYM's negotiation and implementation of the terms of the settlement, thus shielding the trustee from significant forms of liability in connection with the formation and implementation of a settlement which seeks to compromise the claims of the investors to whom BNYM owes fiduciary duties.

17.     As to the substance of the Proposed Settlement, the proposed cash payment is far less than the massive losses investors have faced and will continue to face. And the Settlement's provisions for servicing improvements and mortgage file reconstruction are vague and may prove harmful to investors, as well as many borrowers whose poorly serviced loans are at the heart of the collapse of the trusts at issue.

---

[5]     All but seventeen of the Trusts used PSAs, with the remainder using indentures and SSAs.  The terms relevant to the Settlement are for practical purposes largely similar, and for simplicity's sake this Petition will quote only PSAs.  As does the Bank of New York Mellon, this Petition will refer generally to PSAs, indentures and SSAs as "Governing Agreements."  In the Matter of the Application of Bank of New York Mellon (as trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures), Petitioner, for an order pursuant to CPLR § 7701, seeking judicial instructions and approval of a proposed settlement, Verified Petition dated June 28, 2011 ("Trustee Petition") at ¶ 2-3.

18.     Given the steeply discounted cash payment, the value of any non-monetary consideration is a crucial element in evaluating the Proposed Settlement's fairness.  Here, the Attorney General believes that the proposed settlement's purported servicing improvements are too vague and ill-defined to provide any concrete value to investors.

19.     The servicing improvements encompass several methods for dealing with high-risk loans, including loss-mitigation provisions that require the servicers to consider whether borrowers are eligible for modification programs.  Because performing loans (even when restructured) yield greater returns to investors than foreclosed properties, meaningful servicing improvements and loss-mitigation efforts are essential to adequately compensate investors.  As written, however, the Proposed Settlement's provisions regarding servicing improvement are so vague and permissive that they fall far short of achieving this goal.

20.     For example, the loan servicing improvements call for "high-risk" loans to be placed with subservicers meeting certain qualifications, but they say nothing about the methods the subservicers are required to use in servicing the high-risk loans—the matter of most importance to investors looking to recoup or salvage value from loans at risk.[6] Of even more concern is the fact that the Proposed Settlement identifies loan modifications as an important way to mitigate losses, but expressly makes loan modifications wholly optional:  "nothing [in the relevant provision] shall be deemed to create an obligation . . . to offer any modification or loss mitigation strategy to any borrower."[7]  Moreover, while the proposed settlement describes a methodology for

---

[6]     *Id.* ¶ 5.
[7]     Settlement ¶ 5(d).

choosing loss-mitigation strategies, it includes a substantial escape hatch by allowing servicers to make decisions based on "such other factors as would be deemed prudent in [the servicer's] judgment."[8]

21.     Thus, the Proposed Settlement imposes no concrete requirements or procedures on servicers with respect to loan modification.   The lack of objective standards leaves to servicer discretion such important decisions as principal and interest write-downs, forbearance, or penalty abatements.   The lack of definite standards for "high-risk" loans is inadequate to ensure that BoA will afford sufficient borrower relief and thereby stabilize RMBS loan pools to the benefit of investors.

22.     The inadequacy of these provisions is all the more troubling because BoA has a poor track record in the area of loss mitigation.   Indeed, the Treasury Department recently withheld incentive payments from BoA under a federal loss-mitigation program due to BoA's poor performance in administering loan modifications.[9]   Likewise, BoA has been subject to lawsuits asserting that it has repeatedly withheld reasonable modifications,[10] and has been cited by the Treasury for poor performance as to loan modifications.[11]

## B.     BNYM'S VIOLATIONS OF NEW YORK STATE LAW

### 1.     BNYM Was Aware Of the Trusts' Failure To Transfer Loans

23.     Almost all of the Trusts were governed by PSAs, which define the Trustee's duties.   One of BNYM's primary obligations as trustee under these PSAs was

---

[8]         *Id.* ¶ 5(d)-(e).

[9]         *See e.g.*, Dina ElBoghdady, *Federal Payments Halted to Three Mortgage Servicers*, Washington Post (June 8, 2011).

[10]        *See, e.g.*, *Fraser v. Bank of America*, Index No. 4:10-cv-02400-AGF (E. D. Mo. Dec. 22, 2010); *In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation*, 10-MD-02193 (D. Mass. 2010).

[11]        Dawn Kopecki, *Bank of America Among the Worst for Loan Modifications*, Bloomberg (August 4, 2009), available at http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aoO9FGsvnJOk.

to ensure the proper transfer of loans from Countrywide to the Trusts.  The ultimate failure of Countrywide to transfer complete mortgage loan documentation to the Trusts hampered the Trusts' ability to foreclose on delinquent mortgages, thereby impairing the value of the notes secured by those mortgages.  These circumstances apparently triggered widespread fraud, including BoA's fabrication of missing documentation.

24.    PSAs require actual delivery to the trust of original mortgage documents and assignments of the mortgages in favor of the trust or in blank.  For example, a PSA for one of the Trusts, CWALT 2006 OC-7, between BNYM as trustee, Countrywide Financial Corporation and others (hereinafter referred to as the "Trust PSA")[12] provides that as part of the transfer and assignment, "the Depositor has delivered or caused to be delivered to the Trustee … for the benefit of the Certificateholders" a number of mortgage-related documents.[13]  Proper transfer of these loans was defined by the PSA as including:

> the original Mortgage Note endorsed by manual or facsimile signature in blank in the following form: 'Pay to the order of _____ without recourse,' with all intervening endorsements showing a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note).[14]

25.    To ensure that the mortgage files are intact, PSAs require the Trustee to promptly review the mortgage loan documentation delivered by Countrywide and make an initial certification as to its completeness, noting any defects.  For example, the Trust

---

[12]      Pooling and Service Agreement dated as of August 1, 2006, Alternative Loan Trust 2006-OC-7, between CWALT, Inc., Depositor, Countrywide Home Loans, Inc., Seller, Park Granada LLC, Seller, Park Monaco Inc., Seller, Park Sienna LLC, Seller, Countrywide Home Loans Servicing LP, Master Servicer, and The Bank Of New York, Trustee ("Trust PSA").
[13]      Trust PSA § 2.01(c).
[14]      Trust PSA § 2.01(c)(i)(A).

PSA states that "[t]he Trustee agrees to execute and deliver on the Closing Date to the Depositor, the Master Servicer and Countrywide … an Initial Certification …. Based on its review and examination … the Trustee acknowledges that such documents appear regular on their face and relate to the Mortgage Loans."[15]

26.     Moreover, the PSAs require BNYM to issue a certification of compliance, with exceptions detailing any issues it has identified during the course of its review.[16] The exceptions can range from minor defects to problems of major significance, such as a missing promissory note or assignment.  Pursuant to this provision, BNYM has generated exception reports for each mortgage pool held in each of the Trusts, usually identifying great numbers of files that are incomplete and improperly documented.  Notably, the Proposed Settlement provides for a process to reconstruct or correct the extensive deficiencies noted in the exception reports.

27.     These provisions are central to any mortgage securitization, but they are now vitally important to trust investors in light of the housing market collapse.  Any action to foreclose requires proof of ownership of the mortgage.  This must be demonstrated by actual possession of the note and mortgage, together with proof of any chain of assignments leading to the alleged ownership.  Moreover, complete mortgage files give borrowers assurance that their properties are properly foreclosed upon.  The failure to properly transfer possession of complete mortgage files has hindered numerous foreclosure proceedings and resulted in fraudulent activities including, for example,

---

[15]     Trust PSA § 2.02(a).

[16]     Trust PSA § 2.02(a) ("Not later than 90 days after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) a Final Certification with respect to the Mortgage Loans … with any applicable exceptions noted thereon.").

"robo-signing." These fraudulent activities have burdened borrowers as well as the courts with flawed foreclosure proceedings.

28.     BNYM knew the scope of the loan documentation deficiencies because it issued detailed exception reports for the Trusts.  These deficiencies impaired the value of the securities by compromising the collateral and imposing additional servicing costs.

### 2.     BNYM Violated New York Law By Breaching Its Duty To Notify Certificateholders

29.     Once a trustee learns of an obligor's default—here, Countrywide's failure to deliver complete mortgage files to the Trustee—the trustee is held to a "prudent man" standard of care under New York common law and Article 4-A of the Real Property Law (the "RPL").  *See Ambac Indemnity Corp. v. Bankers Trust Co*., 573 N.Y.S.2d 204, 207 (Sup. Ct. N.Y. Co. 1991) (discussing the obligation of "the trustee in the event of default to carry out his duties with the care and skill a prudent man would use in the conduct of his own affairs."); N.Y. Real Prop. Law Art. 4-A § 126(1) (mandating that trust instruments concerning real estate mortgages and interests therein impose a duty on trusts, in the event of a default, "to exercise such of the rights and powers vested in the trustee by such instrument, and to use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.").

30.     This rule required BNYM to notify investors that the loans securing their notes were impaired by Countrywide's defaults.  PSAs define "Servicer Events of Default" to include:

> any failure by the Master Servicer to observe or perform in any material
> respect any other of the covenants or agreements on the part of the Master
> Servicer contained in this Agreement (except with respect to a failure
> related to a Limited Exchange Act Reporting Obligation), which failure

materially affects the rights of Certificateholders, that failure continues
unremedied for a period of 60 days after the date on which written notice
of such failure shall have been given to the Master Servicer by the
Trustee....[17]

The Trustee gave such notice to Countrywide in the form of exception reports for each of

the 530 Trusts.

31.     The Trustee's knowledge of an event of default is presumed when "a

Responsible Officer of the Trustee shall have received written notice thereof."[18]  Such

notice was actual and abundant, as evidenced by (1) BNYM's own detailed exception

reports, (2) widespread news coverage of foreclosure fraud, and (3) foreclosure actions

brought on BNYM's behalf.  Indeed, the Attorney General's own investigation revealed

numerous foreclosure actions brought on BNYM's behalf which were improperly

brought against New York homeowners.  A review of the records in the Bronx, New

York and Westchester County Clerk's offices reveals that BNYM failed to ensure that

notes were transferred to some of the Trusts:

- In a number of actions the mortgage note was not assigned to the Trustee prior to
  the foreclosure action.  For example, in *Bank of New York v. Kirkland*, Bank of
  New York, as trustee for the Certificateholders CWABS, Inc. Asset-Backed
  Certificates, Series 2006-8, conceded that the mortgage at issue was "to be
  assigned by an Assignment to be recorded in the Office of the Clerk of
  WESTCHESTER County."[19]

- In other cases, the note was allegedly transferred just days before the foreclosure
  action was brought.  In *Bank of New York v. Gioio*, for example, Bank of New
  York, as trustee for the Benefit of CWABS, Inc. Asset-Backed Certificates, Series
  2007-13, alleged that the mortgage was assigned two days before the action was
  filed.[20]

---

[17]     Trust PSA § 7.01(ii).

[18]     Trust PSA § 8.02(viii).

[19]     *See* Complaint ¶ 3 (index no. 07-16839, filed Sept. 4, 2007).

[20]     *See* Complaint ¶ 3 (index no. 08-9865, filed Apr. 30, 2008) (mortgage "duly assigned by
assignment dated the 28th day of April, 2008, and sent for recording in the Office of the Clerk of
WESTCHESTER County.").

Despite these clear indicators, BNYM did not notify any of the parties or seek to halt Countrywide's widespread fraud in improperly prosecuting foreclosure actions.

32.     The *Kemp v. Countrywide Home Loans, Inc.*, 440 B.R. 624, 629 (D.N.J. Bankr. 2010) case demonstrates that the failures to maintain adequate documentation were widespread as to Countrywide-created RMBS trusts.   In *Kemp*, a mortgage foreclosure operations official from BoA testified, and the court found, that it was "customary" for Countrywide "to maintain possession of the original note and related loan documents," rather than transferring those documents to the trustees.  *Id.* at 628.

33.     Indeed, BNYM's own Petition concedes that among claims to be resolved was conduct qualifying as servicer events of default, including:

> Master Servicer breaches of the PSAs, including for example failure "to notify the Trustee and others of Countrywide's breaches of representations and warranties,"[21] and generally placing its interests before those of the investors in breach of the PSAs by among other things "(i) failing to maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage servicing standards; (ii) failing to demand that the Sellers cure deficiencies in mortgage records; (iii) incurring avoidable and unnecessary servicing fees as a result of its allegedly deficient record-keeping; and (iv) overcharging by as much as 100% the costs for maintenance, inspection and other services with regard to defaulted Mortgage Loans"[22]

34.     Thus, BNYM's knowledge that Countrywide consistently defaulted on its duties triggered the Trustee's heightened duty to certificateholders.  At the very least, this heightened duty required BNYM to notify investors – who were relying on BNYM to protect their interests – of Countrywide's defaults.

---

[21]     *Id.* ¶ 29.
[22]     *Id.* ¶ 30.

## CLAIMS AGAINST BNYM

### FIRST CAUSE OF ACTION
(Breach of Fiduciary Duty – New York Common Law)

35.    The Attorney General repeats and re-alleges paragraphs 1 through 35 herein.

36.    The acts and practices of BNYM alleged herein violated New York law in that BNYM owed a fiduciary duty to the trust investors, and breached that duty to their detriment and disadvantage, by failing to notify them of issues regarding the quality of loans underlying their securities after having learned of "events of default," and negotiating the proposed settlement while laboring under a conflict of interest and acting to serve its own ends.

### SECOND CAUSE OF ACTION
(Persistent Fraud or Illegality – Executive Law § 63(12))

37.    The Attorney General repeats and re-alleges paragraphs 1 through 37 herein.

38.    The acts and practices of BNYM alleged herein constitute conduct proscribed by § 63(12) of the Executive Law, in that BNYM engaged in repeated and persistent fraud and illegality by misleading trust investors to believe that:  (1) Countrywide had delivered to BNYM complete and adequate mortgage files relating to the hundreds of thousands of mortgages held by the Trusts; (2) BNYM had, in fact, confirmed the completeness and adequacy of those mortgage files.  In violation of New York common law and the RPL, BNYM knowingly, repeatedly, and consistently failed to notify the Trusts' investors of Countrywide's defaults.

15

39.     As the abuses described above were repeated literally hundreds of times, BNYM's conduct violated Executive Law § 63(12).

## THIRD CAUSE OF ACTION
(Securities Fraud – General Business Law § 352-c(1)(a) and (c))

40.     The Attorney General repeats and re-alleges paragraphs 1 through 40 herein.

41.     The acts and practices of BNYM alleged herein violated Article 23-A of the General Business Law, in that they involved the use or employment of fraud, including acts having a tendency to deceive or mislead, and involved material omissions, deceptions, concealments, suppressions, false pretenses, and the use or employment of representations or statements which were false, where BNYM:  (i) knew the truth, (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made; and such actions were engaged in to induce or promote the issuance or sale within or from this state of securities.

42.     BNYM's conduct described violated the Martin Act insofar as the Trust PSA requires the Trustee to annually certify the following "servicing criteria":

- "Collateral or security on mortgage loans is maintained as required by the transaction agreements or related mortgage loan documents;"

- "Mortgage loan and related documents are safeguarded as required by the transaction agreements;" and

- "Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements."[23]

---

[23]     *See generally* Trust PSA, Exhibit W.

43.     Thus, investors in the Trusts were misled by BNYM into believing that BNYM would review the loan files for the mortgages securing their investment, and that any deficiencies would be cured.

## CONCLUSION

WHEREFORE, proposed Intervenor Counter-Plaintiff demands judgment against Petitioner as follows:

A.     Entering an order rejecting the Proposed Settlement as presented;

B.     Directing that Petitioner Counter-Defendant, pursuant to Article 23-A of the General Business Law and Section 63(12) of the Executive Law and the common law of the State of New York, disgorge all gains, pay all penalties and pay all restitution and damages caused, directly or indirectly, by the fraudulent and deceptive acts complained of herein;

C.     Directing that Petitioner pay Intervenor Counter-Plaintiff's costs, including attorneys' fees as provided by law;

D.     Directing such other equitable relief as may be necessary to redress Petitioner Counter-Defendant's violations of New York law; and

     E.      Granting such other and further relief as may be just and proper.

Dated: August 4, 2011
      New York, New York

                  ERIC T. SCHNEIDERMAN
                  Attorney General of the State of New York

                  By: _____
                         MARIA FILIPAKIS

                  Special Deputy Attorney General
                  120 Broadway, 23rd Floor
                  New York, New York 10271
                  (212) 416-8493

                  *Counsel for Proposed Intervenor Counter-Plaintiff*

*Of Counsel:*

DANIEL S. ALTER
MARC B. MINOR
THOMAS TEIGE CARROLL
AMIR WEINBERG

**VERIFICATION**

I, Maria Filipakis, hereby affirm under the penalty of perjury that the following is true and correct:

I am a member of the bar of this Court and Special Deputy Attorney General in the Office of the New York State Attorney General.  I have read the foregoing Pleading in Intervention and know the contents thereof.  All statements of fact therein are true and correct to the best of my knowledge and belief.

Executed this Fourth Day of August, 2011, in New York, New York.


_____
Maria Filipakis